OPINION
{¶ 1} In this case, ESKE Properties and Frick Entertainment VI, Inc. (ESKE and Frick) appeal from a trial court decision granting summary judgment in favor of Gregory Sucher, Susan Sucher, and Vandalia Auto Clinic, Inc. (collectively, Sucher and Vandalia Auto). The claims against Sucher and Vandalia Auto arose from certain transactions involving real property located at the corner of National Road and Foley Road in Vandalia, Ohio. From 1982 to 1988, Gary Sucher operated an automobile repair shop on the property, which was owned by Marathon Oil. In 1987 or 1988, Marathon told Sucher that if he did not want to purchase the property, it would be sold to someone else. At the time, Sucher leased the property on a month-to-month tenancy. The property for sale included the repair shop (formerly a gas station) and a restaurant that was located north of the shop. The original asking price was $400,065.
 {¶ 2} Because Sucher was not interested in the restaurant, he contacted an acquaintance, Eric Sonnenberg. Sucher had known Sonnenberg since childhood, and Sonnenberg had previously expressed interest in buying the restaurant property. Sonnenberg was a builder who did residential and light commercial construction. Although Sonnenberg was interested, he wanted to include Ed Kress because Kress was experienced with leases and obtaining tenants. Kress and Sonnenberg were each 50% shareholders in ESKE, and had known each other since high school. Kress was also an attorney.
 {¶ 3} The final negotiated purchase price for the two properties was $210,000. ESKE paid $105,000 for the restaurant and .455 acres, while Sucher paid the same amount for the repair shop and .834 acres. Before the sale, restaurant customers had parked in the part of the property Sucher now owned. Because ESKE anticipated keeping and upgrading the restaurant site, ESKE wanted to continue the parking arrangements. Consequently, ESKE and Sucher signed and recorded an easement agreement, which granted ESKE both driveway and parking easements. Regarding the parking easement, the agreement provided that:
 {¶ 4} "Sucher grants to ESKE, on the terms and conditions contained in this Agreement, a perpetual non-exclusive agreement on, over and across the Sucher Property for purposes of providing parking for customers, employees and any other person using or patronizing the ESKE property or the business located thereon * * *. * * * The Parking Easement shall be for the benefit of, and useable by, both ESKE and Sucher, and all persons claiming by or through them, and their successors and assigns."
 {¶ 5} Gary Sucher was also concerned about what might happen if ESKE sold its building. As a result, the easement agreement further stated that:
 {¶ 6} "Sucher reserves the right to use the Parking Easement for expansion of the building currently located on the Sucher property, regardless of whether such expansion reduces or eliminates the Parking Easement, provided that any portion of the Parking Easement remaining after such expansion shall continue to be subject to the terms of this Agreement and the legal description of the reduced Parking Easement shall be substituted for the description contained herein. This right shall be personal to Sucher, shall be exercisable only by them and shall not be transferable in any fashion to any heir, successor or assignee."
 {¶ 7} The parking easement was located west of Sucher's existing repair shop. However, Kress testified that ESKE had an oral agreement with Gary Sucher, before the easement agreement was signed, and confirmed afterwards, that Sucher would use all reasonable efforts to expand his business somewhere other than on the west side. In testimony, Kress referred to this as the "redevelopment agreement."
 {¶ 8} Gary Sucher's recollection was different. During a preliminary injunction hearing, Sucher testified that he never made any oral promises to Sonnenberg or Kress about the easement agreement. However, during his prior deposition, Sucher indicated that he did make promises, as follows:
 {¶ 9} "Q. You never said to Mr. Kress that you would look into all other possibilities on your property before you would build on the west side?
 {¶ 10} "A. Down the road, I did."
 {¶ 11} In the deposition, Sucher said that he told Kress both before and after the closing that he would look into all possibilities or options on his property before he built on the west side. The following additional exchange occurred during Sucher's deposition:
 {¶ 12} "Q. * * * Now, I still don't understand what language you gave — you said to Mr. Kress about all possible options or whatever that language was.
 {¶ 13} "A. What I told him is that I would look into building, and in the contents [sic] of the conversations, I told him I would look in and see if it was feasible, reasonable, possible. I didn't use all those words, but that's what I meant when I said I'd look into it on other spots on the property."
 {¶ 14} In contrast, Sucher claimed during the preliminary injunction hearing that he never mentioned anything about other options before the closing. He also said that he did not say he would build on the east side if it was reasonable, feasible or possible; instead, his comment was that all these factors had to be satisfied. Thus, there are obvious factual disputes concerning the alleged oral agreement, not just between the parties, but also within Sucher's own testimony.
 {¶ 15} The closing on the property and execution of the easement agreement occurred on May 4, 1988. From that point until 1994, business proceeded without incident. ESKE leased the restaurant in March, 1989, to Coleman's Public House, Inc., which made some improvements to the building. The primary term of the lease was until July 31, 1996, with an option for one five year renewal term. However, Coleman's began having serious back rent problems and eventually defaulted on the lease. At some point in 1993, Ray Frick, owner of Fricker's Restaurants, was considering putting a restaurant in the Vandalia area. Frick was a client of Kress's, and the two men talked about whether Frick had any interest in acquiring the Coleman's site. Frick then negotiated with Coleman's about a buy-out of the lease and with ESKE about leasing the building. In the process, Frick visited the restaurant site and was concerned with parking, which was a bit tight. He also received the paperwork on the easements. Both Kress and Sonnenberg indicated there was a verbal agreement with Sucher about building on the easement west of Sucher's building. Frick's understanding of the agreement was that Sucher could build on the easement, but had verbally agreed not to build on it if was at all possible to build anywhere else on the property.
 {¶ 16} Frick was satisfied with the representations about the agreement, but Kress insisted that he hear it from Sucher. As a result, Frick met with Gary Sucher and Kress twice in March, 1994, before the ESKE/Frick lease was signed on March 31, 1994. The first meeting took place on March 9, 1994. Before the meeting, Frick had his architect draw up a plan of both properties, including the existing buildings and all available parking spaces. The plan is dated February 28, 1994. At the first meeting, Sucher and Frick discussed parking, traffic patterns, closing one of the driveways, and where Sucher might expand his own building to least impact everyone on a negative basis. Frick related his concerns about visibility, parking, and traffic flow. In the meeting, Sucher agreed to exhaust all opportunities for building elsewhere on the property before he built on the west (or Foley Drive) side of his building. Sucher indicated where he intended to expand, and Frick's general contractor penciled in the location of the proposed expansion on the plan. The plan of February 28, 1994, was submitted as an exhibit and contains penciled-in items, including a block labeled "EXP" (for expansion) on the east side of Sucher's building.
 {¶ 17} In the March meetings, Frick agreed to make various improvements to Sucher's property, including removing concrete barriers, patching, putting down asphalt and re-striping the lot. Frick also included some "reserved" spots on the east that Sucher requested, put "no parking" signs in front of a gate to a dumpster on Sucher's property, and "no parking" signs in front of Sucher's bay doors. At the hearing, Frick identified a bid for what he had agreed to do. The total included $240 for removing and resetting concrete blocks; $17,860 for removing concrete posts, a tree and concrete curbs, and for excavating and applying new asphalt; and $2.50 per stall for re-striping. Another bid of between $5,600 and $8,900 was also identified, for additional parking lot work Frick did as a "good neighbor," after the agreement with Sucher.
 {¶ 18} After obtaining Sucher's agreement about building in the easement, Frick signed a lease with ESKE and spent more than $400,000 renovating the restaurant, including the above improvements to Sucher's property. Frick testified that he would not have taken any of these actions absent the oral agreement with Sucher.
 {¶ 19} In contrast, Sucher denied that he had made any promises to Frick or even discussed the easement with Frick. Sucher admitted having a discussion with Frick about the parking lot. According to Sucher, Frick wanted to get the most from the lot. Frick offered to remove all sorts of old concrete items, and to re-pave and re-stripe the entire lot. Frick asked to use some of the other parking in Sucher's lot, outside the easement area, but Sucher was unwilling to give Frick that right. However, Sucher said that if Frick made all the improvements in question, he would be willing to "try" to make any open parking spots available to Frick's customers. Sucher stressed that if any beer bottles or trash were thrown around, or if one of Sucher's customers came and did not have a place to park, or had a car damaged, Sucher would no longer let Frick's customers park in the non-easement area of the lot. Sucher also gave Frick an interstate sign pole that was on the property.
 {¶ 20} Between 1994 and 1996, there were no problems. At some point in 1996, Sucher talked to Sonnenberg about expanding. At that time, Sucher had two bays that were used for auto repair. The bays were located on the east side of the building, and the access doors to the bays faced east. Each bay had an in-ground hydraulic lift. Sucher and Sonnenberg talked about putting two additional bays on the east side, adjacent to the existing bays, for a total addition of about 28 by 32 feet. Utilities and everything else were in place and accessible and the configuration would keep Sucher's mechanics in one confined area. As a builder, Sonnenberg felt it made more sense to make the addition on the east side, to keep all the bays together. There was no discussion of putting an addition on the west side of the building.
 {¶ 21} Because the price Sonnenberg mentioned was quite high, Sucher took no action at that time. Subsequently, Sucher talked to another builder (Al Butler) and looked at a building Butler was working on. The construction was for a facility similar to what Sucher wanted, would contain four bays, was about 40 by 60 feet, and was significantly cheaper than Sonnenberg's estimate.
 {¶ 22} Kress and Sonnenberg then met Sucher at the site to discuss Sucher's plans. According to Kress, this meeting followed a conversation in which Sucher stated that he wanted the easement to "go away." During the site meeting, Sucher said his contractor had estimated an additional cost of $8,000 to put the same building on the east side. Discussions about the expansion did not resolve any issues, and Sucher ultimately accepted a bid to build on the west side, in the easement area.
 {¶ 23} ESKE and Frick filed the present lawsuit in May, 1999, and asked the court to enjoin construction. After a preliminary injunction hearing, the magistrate issued a decision, finding that ESKE was not likely to succeed on the merits, but that Frick was likely to succeed. The magistrate concluded that the Statute of Frauds did not apply to Frick's claim, based on promissory estoppel and the representations made in 1994. In addition, the magistrate found that Frick made about $8,000 in parking lot improvements to Sucher's property in reliance on Sucher's agreement to only expand on the west side if other expansion was not feasible. The trial court subsequently overruled Sucher's objections to the magistrate's decision, and continued the preliminary injunction.
 {¶ 24} Eventually, in May, 2002, Sucher filed a motion for summary judgment. In contrast to its earlier ruling, the trial court held that promissory estoppel did not apply because estoppel is a defense to the Statute of Frauds in only two circumstances: 1) where there is a misrepresentation that the statute has been complied with; and 2) where one party promises to formalize an agreement in writing, but does not. Since neither circumstance existed in the present case, the court granted summary judgment in favor of Sucher and Vandalia Auto. The court also found that the parol evidence rule applied. ESKE and Frick now appeal, raising the following assignments of error:
 {¶ 25} I. The trial court erred in granting summary judgment based upon the parol evidence rule because the rule does not apply to future oral agreements and did not apply to the agreement between Sucher and Frick in 1994.
 {¶ 26} II. The trial court erred in granting summary judgment based upon the statute of frauds.
 {¶ 27} III. The trial court erred in granting summary judgment because, alternatively, even if the statute of frauds applies, the equitable exceptions preclude the defense."
 {¶ 28} After considering the law and the record, we find the third assignment of error well-taken, but only with regard to the claims brought by Frick. Accordingly, the summary judgment in favor of Sucher and Vandalia Auto will be affirmed in part and reversed in part, and this case will be remanded for further proceedings.
 I {¶ 29} The trial court found, after applying the parol evidence rule, that Plaintiffs could nox enforce any promises Sucher made before entering into the written easement agreement. In the first assignment of error, ESKE and Frick contend that the court erred because the parol evidence rule would not apply to future oral agreements, including the agreement between Sucher and Frick in 1994. Sucher claims that this assignment of error is without merit, because written agreements may not be altered by prior or contemporaneous oral promises.
 {¶ 30} We review summary judgment decisions de novo, i.e., "we apply the standards used by the trial court." Brinkman v. Doughty
(2000),140 Ohio App.3d 494, 496. Summary judgment is appropriately granted where a trial court finds: "(1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor." Harless v. Willis Day WarehousingCo. (1978), 54 Ohio St.2d 64, 66.
 {¶ 31} In evaluating the claims, it is important to bear in mind the differing status of the parties and what agreements are at issue. Unfortunately, the failure of the parties and the trial court to correctly identify these matters has introduced unnecessary confusion.
 {¶ 32} One set of agreements involves the 1988 written parking easement, and the oral agreements Sucher and ESKE allegedly made before and after they signed the written agreement. Notably, Frick was never a party to this contract. In fact, Frick and Sucher never entered into any written agreements; instead (accepting Frick's testimony as true), Frick and Sucher only made oral agreements in 1994, about parking lot improvements and Sucher's plans for expansion.
 {¶ 33} Under the parol evidence rule:
 {¶ 34} "`absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements.' * * * Despite its name, the parol evidence rule is not a rule of evidence, nor is it a rule of interpretation or construction. * * * `The parol evidence rule is a rule of substantive law which, when applicable, defines the limits of a contract.'" Galmish v. Cicchini, 90 Ohio St.3d 22, 27, 2000-Ohio-7
(citations omitted).
 {¶ 35} Based on the above rule, any oral agreements that Sucher and ESKE made before they signed the 1988 written parking easement agreement could not alter the terms of the written agreement. Therefore, the trial court correctly rejected any claims based on alleged prior or contemporaneous oral agreements.
 {¶ 36} However, these were not the only claims. To the contrary, Kress testified that Sucher orally agreed, after the parking easement was signed, to use all reasonable efforts to expand elsewhere than on the west side, i.e., the easement area. Under established law, even a completely integrated agreement can be orally modified. Pingue v.Durante (May 9, 1996), Franklin App. No. 9-5APG09-1241, 1996 WL 239642, *3. The easement agreement also does not contain language prohibiting the parties from modifying or terminating the agreement. In fact, Section 4 specifically allows for amendment or termination. As a result, nothing prevented Sucher and ESKE from orally modifying the easement agreement after it was signed.
 {¶ 37} Furthermore, although no consideration appears to have existed for the modification, "`[a] gratuitous oral agreement to modify a prior contract is binding if it is acted upon by the parties and if a refusal to enforce the modification would result in a fraud or injury to the promisee.'" Id. Thus, Sucher's subsequent oral agreements could be enforced, under appropriate circumstances.
 {¶ 38} In their brief, ESKE and Frick contend that the trial court erred in applying the parol evidence rule to bar enforcement of oral promises made before and after execution of the easement agreement. However, this is not what the trial court said. The court did say that oral promises made before the agreement were barred by the parol evidence rule, and we have already concluded that the decision on that point was correct. The court then stated that ESKE's claims were also barred by the Statue of Frauds, which requires agreements concerning interests in land to be memorialized in writing. See R.C. 1335.05. When making this statement, the court incorrectly failed to distinguish between the claims of ESKE and Frick, or to consider them separately. This may explain why ESKE and Frick have inaccurately described the trial court's conclusions about the parol evidence rule.
 {¶ 39} In any event, the trial court did correctly apply the parol evidence rule to bar enforcement of oral agreements that were made prior to or contemporaneous with the execution of the written parking easement. The court did not use the rule to bar subsequent agreements. Since the court's conclusions about these issues were correct, the first assignment of error is without merit and is overruled.
 II {¶ 40} In the second assignment of error, ESKE and Frick contend that the trial court erred in finding their claims precluded by the Statute of Frauds. In pertinent part, R.C. 1335.05 provides that:
 {¶ 41} "[n]o action shall be brought * * * to charge a person * * * upon a contract or sale of lands, tenements, or hereditaments, or interest in or concerning them, * * * unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized."
 {¶ 42} When the trial court discussed summary judgment based on the Statue of Frauds, it referred specifically only to ESKE. In this regard, the court found that ESKE was attempting to enforce an oral promise that would restrict Sucher's use of the property. The court then held that this promise was "one concerning land" and was unenforceable because it was not in writing. The court did not clarify whether this conclusion also applied to the alleged oral agreement with Frick. However, we assume this was the court's intent, since summary judgment was granted against both Frick and ESKE.
 {¶ 43} Analysis of this point is further complicated by the fact that ESKE and Frick discuss the Statute of Frauds solely in the context of the "good neighbor" agreement. However, this is only how Frick characterized his own oral agreement with Sucher. ESKE's witnesses did not refer to an oral "good neighbor" agreement between ESKE and Sucher. Instead, the oral agreements between ESKE and Sucher were referred to as "redevelopment agreements."
 {¶ 44} For purposes of discussion, we will assume that the trial court intended to classify all the alleged oral agreements as promises involving an interest in land ESKE and Frick contend such a classification is incorrect for two reasons. The first reason is that the "good neighbor" agreement did not transfer an interest in land that would invoke the Statute of Frauds. Specifically, the agreement did not transfer title, ownership, or possession of the land, but merely required Sucher to exhaust alternatives, in good faith, before building in the easement area.
 {¶ 45} The second reason for rejecting the classification is that Sucher's original right to build over the easement was not an interest in land, but was an irrevocable license coupled with an interest. As such, the license to build was not subject to the Statute of Frauds and any modification of the license was also not governed by the statute.
 {¶ 46} Taking these points in order, we find that the right to build over the easement was an interest in land, not a license. "The basic definition of an easement is that it is the grant of a use on the land of another. * * * `When created by conveyance, the extent of the privilege of use to which the owner of an easement created by conveyance is entitled is dependent upon the provisions of the conveyance. The creation of an easement by conveyance consists in the creation of certain privileges of use. * * *'" Alban v. R.K. Co. (1968), 15 Ohio St.2d 229,231-32, quoting from 2 Casner, American Law of Property, Section 8.64. "Generally, the term `interest in land' means some portion of the title or right of possession, and does not include agreements which may simply affect the land * * * Thus, easements are `interests in land' subject to the Statute of Frauds, but licenses are not." Ferguson v. Strader
(1994), 94 Ohio App.3d 622, 627 (citations omitted).
 {¶ 47} In contrast to an easement, a license is "a personal, revocable, and nonassignable privilege, conferred either by writing or parol, to do one or more acts upon land without possessing any interests in the land" DePugh v. Mead Corp. (1992), 79 Ohio App.3d 503, 511. A license has also been defined as "`an authority to do a particular act or series of acts upon another's land, without possessing any estate therein.' * * * One who possesses a license thus has the authority to enter the land in another's possession without being a trespasser."Mosher v. Cook United, Inc. (1980), 62 Ohio St.2d 316, 317 (citation omitted).
 {¶ 48} Sucher's retention of the right to build in the easement has some indicia of a license, because it is personal and is not assignable. However, unlike a licensee, the Suchers possessed an interest in the land, because they were the owners of the land Even though the Suchers conveyed a part of their interest to ESKE, they retained as much interest as they conveyed. Specifically, both Sucher and ESKE had the right to park in the easement area; it was not a right exclusive to ESKE. Furthermore, the easement agreement merely restored to the Suchers what they already had as property owners, i.e., the right to build on the land Because Sucher possessed an interest in the land that was the subject of the oral promise, we fail to see how the right to build could be considered a license.
 {¶ 49} Alternatively, ESKE and Frick argue that the right to build over the easement was an irrevocable license coupled with an interest. Again, we disagree. "If the parties intend the agreement to be permanent in nature, the license is said to be coupled with an interest. * * * A license coupled with an interest becomes irrevocable, meaning that it is no longer terminable at the will of the licensor, and constitutes a right to do the act rather than a mere privilege to do it." Cambridge VillageCondominium Assn. v. Cambridge Condominium Assn. (2000),139 Ohio App.3d 328, 333-334. While this might conceivably describe Sucher's interest, "[a]n irrevocable license is said to be an easement rather than a license." Id. Therefore, even if we assume that Sucher had an irrevocable license coupled with an interest, he would still have had an easement, or interest in land, to which the Statute of Frauds applies. See, also, Association for Responsible Development v. FieldstoneLtd. Partnership (Nov. 13, 1998), Montgomery App. No. 16994, 1998 WL 785330, *7 (finding that a promise to restrict the use of property is one concerning land for purposes of the Statute of Frauds).
 {¶ 50} For the same reasons, the alleged "good neighbor" agreement between Frick and Sucher also involved an interest in land to which the Statute of Frauds applies. Accordingly, we conclude that both the "redevelopment agreement" and the "good neighbor" agreement may not be enforced absent compliance with the Statute of Frauds.
 {¶ 51} The final issue mentioned in the second assignment of error is the effect of the "one-year" rule in the Statute of Frauds. In addition to requiring that agreements conveying interests in property be in writing, R.C. 1335.05 provides that:
 {¶ 52} "[n]o action shall be brought * * * to charge a person * * * upon an agreement that is not to be performed within one year from the making thereof; unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized."
 {¶ 53} In granting summary judgment, the trial court did not discuss or rely on this part of the Statute of Frauds. However, Sucher raised this issue in the motion for summary judgment filed below, and ESKE and Frick also included the point in their initial brief, presumably anticipating that Sucher would use it as an alternate argument for sustaining summary judgment. Since we have already concluded that the Statute of Fraud applies, we see no reason to discuss an alternate ground for subjecting the oral agreements in this case to the statute.
 {¶ 54} To the extent that the second assignment of error contests the application of the Statute of Frauds, it is without merit and is overruled. However, the fact that the Statute of Frauds applies does not necessarily mean that summary judgment was merited. Specifically, exceptions to the Statute of Frauds exist, and may allow an action to proceed even where an agreement is not in writing. Because the third assignment of error deals with these situations, we will defer a decision on the appropriateness of summary judgment until after our discussion of the final assignment of error.
 III {¶ 55} In the third assignment of error, ESKE and Frick contend that even if the Statute of Frauds applies, equitable exceptions preclude its use. The equitable exceptions in question are the doctrines of "part performance" and promissory estoppel. ESKE and Frick raised part performance in their reply to summary judgment, but the trial court did not address this issue. Instead, the court only considered promissory estoppel. The court found that promissory estoppel arises in only two circumstances: 1) where a party misrepresents that the Statute of Frauds has been complied with; and 2) where a party promises to formalize the oral agreement into a writing. Because the record did not demonstrate either circumstance, the trial court refused to apply promissory estoppel.
 {¶ 56} ESKE and Frick acknowledge that our appellate district has followed the above promissory estoppel rule, which has been described as more restrictive than the rule some courts use. See McCarthy, Lebit,Crystal Haiman, Co., L.P.A. v. First Union Mgt., Inc. (1993),87 Ohio App.3d 613, 627, discussing limitations placed on promissory estoppel by the Restatement of Contracts 2d (1932), Section 178, Comment f.
 {¶ 57} In McCarthy, the Eighth District commented on the fact that at least one Ohio court had recognized that a party may rebut the Statute of Frauds by using the doctrine of promissory estoppel. Id. at 625, citing Gathagan v. Firestone Tire Rubber Co. (1985),23 Ohio App.3d 16. Previously, in Gathagan, the Ninth District Court of Appeals found the following general principle "very persuasive" in a case involving a contract that fell within the Statute of Frauds:
 {¶ 58} "`"[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce the action or forbearance is enforceable notwithstanding the Statute of Frauds if injustice can be avoided only by enforcement of the promise. The remedy granted for breach is to be limited as justice requires."'" 23 Ohio App.3d at 18 (citations omitted).
 {¶ 59} After discussing various approaches, including the one followed in Gathagan (which did not restrict the doctrine), the McCarthy
court agreed with the general estoppel principle. However, the court decided to adopt:
 {¶ 60} "[t]he approach taken by those courts which hold that the doctrine of promissory estoppel may be used to preclude a defense of statute of frauds, but only when there has been (1) a misrepresentation that the statute's requirements have been complied with or (2) a promise to make a memorandum of the agreement. This approach adheres to the equitable doctrine of promissory estoppel as adopted by the Ohio Supreme Court and stated in Restatement 2d of Contracts, Section 90. Additionally, it promotes a balanced approach to encouraging those in business to reduce their agreements to writing and thereby adhering to the policy considerations behind the statute of frauds while at the same time providing a mitigating effect to the harsh application of the statute of frauds and assures fairness in business relationships by protecting one who relies to his detriment on the promise of another."87 Ohio App.3d at 627.
 {¶ 61} Subsequently, we cited Gathagan in Beaverpark Associates v.Larry Stein Realty Co. (Aug. 30, 1995), Montgomery App. No. 14950, 1995 WL 516469, and recognized that "the statute of frauds should be used to prevent fraud rather than `as a shield to protect fraud.'" Id. at *4, quoting from Gathagan, 23 Ohio App.3d at 17. However, we also said we did not find the argument persuasive under the facts of the Beaverpark case. The first fact we mentioned was that the plaintiff had failed to raise estoppel in the proceedings below. Id. at *5. The second "fact" we mentioned was that some courts allowed a promissory estoppel claim to bar a Statute of Frauds defense, but applied the doctrine only in narrow circumstances. First, promissory estoppel was applied only if pled as a separate cause of action. Id. In this regard, we again noted that theBeaverpark plaintiff had failed to raise promissory estoppel as a separate cause of action. Id.
 {¶ 62} The second circumstance involved the restrictions noted inMcCarthy, i.e., that there must be "either a misrepresentation that the statute of frauds' requirements have been complied with or a promise to make a memorandum of the agreement." Id. We found that neither circumstance was present in Beaverpark.
 {¶ 63} Notably, we did go on to find that even if we applied promissory estoppel, summary judgment would still be appropriate because the plaintiff did not present adequate evidence to survive summary judgment. Id. As a result, we overruled the assignment of error that was based on promissory estoppel. Id. at *5-6.
 {¶ 64} Subsequently, in Fieldstone (Nov. 13, 1998), Montgomery App. No. 16994, 1998 WL 785330, we noted that the law on the subject was mixed, and reiterated the view we took in Beaverpark. Id. at *7. In contrast to Beaverpark, the plaintiffs in Fieldstone did assert a separate cause of action for promissory estoppel. Id. at *8. Nonetheless, we found the claims barred by the Statute of Frauds due to a lack of evidence that the defendants either misrepresented compliance with the statute or failed to make a promised memorandum. Id.
 {¶ 65} As in Beaverpark, we went on to apply the less restrictive theory of promissory estoppel. The promises in Fieldstone had nothing to do with reducing an agreement to writing. Instead, the defendant had promised not to build low-income housing on a piece of property. Id. at *6. We once again found the evidence insufficient to establish promissory estoppel. Id. at *7. In particular, we relied on the fact that the alleged promises were made during a zoning hearing and could not have been construed as binding, since the speaker qualified his presentation by stating that development plans were not final. Therefore, we concluded that his statements were not promises, but were, at most, predictions or opinions about future conduct. Id.
 {¶ 66} ESKE and Frick urge us to apply the less restrictive view of estoppel. They suggest that Beaverpark only adopted a narrow view of promissory estoppel because the party seeking relief was one of the original parties to the contract. In contrast, Frick was not a party to the original easement agreement and lacked the ability to insist that his "good neighbor" agreement be incorporated into the six-year old easement. Sucher does not reply specifically to this point, but simply urges us not to overrule a decade of "binding case authority."
 {¶ 67} Before addressing these points, we should note that recently, in Shampton v. Springboro, 98 Ohio St.3d 457, 2003-Ohio-1913, the Ohio Supreme Court stressed that it had adopted the doctrine of promissory estoppel set forth in Restatement of the Law 2d, Contracts (1981), Section 90. 2003-Ohio-1913, at ¶ 32.
 {¶ 68} This section of the Restatement provides that:
 {¶ 69} "`[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'" Id. at ¶ 33.
 {¶ 70} This is the unrestricted general principle applied inGathagan, and discussed in McCarthy. See Gathagan, 23 Ohio App.3d 16,18, and McCarthy, 87 Ohio App.3d 613, 625. Like McCarthy, Shampton
involved claims for breach of contract and promissory estoppel in connection with the lease of real property. Specifically, in Shampton,
the City of Springboro owned a golf course and wanted to lease the restaurant at the course to a private party. The city manager and the plaintiff negotiated for a long-term lease, and agreed on various items set forth in an unsigned document. However, some issues were still outstanding. In order for plaintiff to begin restaurant operations quickly, city council authorized the city manager to enter into a temporary lease. The city manager and plaintiff subsequently signed a lease that allowed either party to terminate without cause, by giving thirty days notice. Council also instructed the manager to proceed with negotiations for a long-term lease. However, no long-term lease was ever executed. Id. at ¶ 1-17.
 {¶ 71} The plaintiff closed a restaurant he had been operating elsewhere, made financial investments in the city's facility, and began running the restaurant. Id. at ¶ 18. When the parties could not reach agreement on property tax liability, the city terminated the short-term lease and indicated it would not enter into a long-term lease. After further negotiations were unsuccessful, the plaintiff vacated the premises. Plaintiff then sued the city, claiming breach of contract and promissory estoppel. Jury verdicts were received on these claims in the respective amounts of $85,000 and $120,000. Id. at ¶ 20.
 {¶ 72} On appeal, the Ohio Supreme Court reversed both verdicts. The court first rejected a breach of contract claim, because the city did not authorize its manager to enter into a long-term lease without further approval by council of the terms. Id. at 30. In addition, documents indicated that the parties failed to reach agreement on some material terms. Id. at 31.
 {¶ 73} Regarding the promissory estoppel claim, the court indicated that it had adopted the doctrine of promissory estoppel set forth in the Restatement of the Law2d Contracts (1981), Section 90. After applying the doctrine, the court concluded that the plaintiff could not reasonably have relied on representations made by the city manager. Specifically, the resolutions that council passed put plaintiff on notice that the city manger did not have authority to enter into a long-term lease. Id. at ¶ 34.
 {¶ 74} In Shampton, the Ohio Supreme Court did not refer to or rely on any restrictions placed on the doctrine of promissory estoppel by the Restatement of Contracts. The oral agreement also does not appear to factually fit within the restrictions in McCarthy, because the promise in question was that the city would enter into a long-term lease. The city did not represent that a written agreement existed, nor did the city promise to make a memorandum of the agreement. In fact, from the Ohio Supreme Court's comments, it is clear that an agreement was never reached.
 {¶ 75} However, some ambiguity in the facts exists, as the dissent in Shampton referred to the city manager's representation "that the written lease was forthcoming." Id. at ¶ 38. The appellate court opinion also says that:
 {¶ 76} "there was a clear and unambiguous promise made * * * [which] acknowledged that the lease term would be for fifteen years with three-year renegotiation provisions. * * * [Plaintiff] relied upon the promise of a long-term lease by investing in the property and operating the restaurant for twenty months. Because of continued assurances that the long-term lease would be executed promptly, it was reasonable and foreseeable for * * * [Plaintiff] to rely upon the promise of a long-term lease. Once [the City] * * * refused to enter into a long-term lease * * *, [Plaintiff] * * * was injured by the reliance upon that promise. * * * Therefore, a claim for promissory estoppel is not precluded against * * * [the City] since the acts of its agent * * * were done within the scope and course of his authority or employment." Shampton v. City ofSpringboro (Nov. 13, 2001), Warren App. Nos. CA 2000-08-080 and CA 2000-09-081, 2001 WL 1403051, *6, reversed, 2003-Ohio-1913,98 Ohio St.3d 457.
 {¶ 77} Due to this ambiguity, we cannot say without reservation that the Ohio Supreme Court would apply promissory estoppel in cases involving interests in land, without the restrictions outlined inMcCarthy — although we do believe this is a correct statement of the law as it now exists. Under this theory, of course, the trial court's decision on summary judgment as to Frick's claims would be incorrect and should be reversed. The court's decision would not be incorrect as to ESKE, however. Even if we accept as true the testimony that Sucher made oral promises to ESKE after the written easement agreement was executed, the record fails to show any action or forbearance on ESKE's part as a result of the promises. Consequently, even if we could apply promissory estoppel, ESKE's claims would still be barred.
 {¶ 78} For purposes of the present case, we do not have to decide if the more liberal estoppel standard should be applied to Frick. The Statute of Frauds also does not bar recovery "where an oral lease has been partially performed." Miami Valley United Methodist Mission Soc. v.White-Dawson (March 3, 2000), Montgomery App. No. 17873, 2000 WL 234712, *4. Part performance sufficient to remove an agreement from the Statute of Frauds:
 {¶ 79} "must consist of unequivocal acts by the party relying upon the agreement, which are exclusively referable to the agreement and which have changed his position to his detriment and make it impossible or impractical to place the parties in status quo. * * * If the performance can reasonably be accounted for in any other manner or if plaintiff has not altered his position in reliance on the agreement, the case remains within the operation of the statute." Delfino v. Paul Davies Chevrolet,Inc. (1965), 2 Ohio St.2d 282, 287 (citations omitted).
 {¶ 80} Our own district has noted that "[g]enerally, in cases involving real estate, courts require acts such as possession, payment of consideration, and improvements on the land in order to find part performance of the contract." Beaverpark (Aug. 30, 1995), Montgomery App. No. 14950, 1995 WL 516469, *3. We declined to apply the part performance exception in Beaverpark because the plaintiff failed to present any evidence that it performed specific acts to its prejudice in reliance on the alleged oral contract. Id. at *4.
 {¶ 81} In contrast, Frick performed specific acts to his prejudice in reliance on the alleged oral contract. Specifically, Frick made substantial improvements to Sucher's property, including removing concrete barriers, patching, putting down asphalt and re-striping the lot. Frick also included some "reserved" spots on the east that Sucher requested, put "no parking" signs in front of a gate to a dumpster on Sucher's property, and "no parking" signs in front of Sucher's bay doors. These items are exclusively referable to the alleged oral agreement, at least if one accepts Frick's testimony. Although Sucher disagreed, that is a factual issue for trial, and should not be resolved via summary judgment.
 {¶ 82} Additionally, Frick did change his position to his detriment in reliance on the alleged agreement. Frick testified that without the agreement with Sucher, he would not have leased the restaurant site and would not have expended more than $400,000 for improvements to the property, including the improvements to Sucher's property. The initial lease term for which Frick was contractually obligated was ten years.
 {¶ 83} Sucher contends that Frick's renovation expenses were not part of an agreement to benefit Sucher, but benefitted only Frick, ESKE, and Frick's customers. This may be true with regard to renovations on ESKE's property, but it is not true of improvements made to Sucher's property. Furthermore, this argument misses the point. Frick's testimony was that he would not have entered into the lease and would not have made any renovations, including those to Sucher's property, absent Sucher's agreement about building in the parking easement area. The reason for this was that parking and visibility (which would be restricted by a building on the easement) were critical concerns in Frick's choice for a restaurant site.
 {¶ 84} Sucher does admit that some expenses were "arguably" referable to part performance, but dismisses these expenses as amounting only to a "few hundred dollars" for repaving (a fact that is not established by the record). In contrast, the invoices show significant expenses for removing concrete barriers, repaving, and re-striping.
 {¶ 85} Sucher also claims the improvements were an existing obligation of ESKE and Frick established by the agreement between ESKE and Sucher. This argument is yet another example of how the parties and trial court have created unnecessary confusion by referring interchangeably to Frick and ESKE and their obligations. Contrary to Sucher's implication, Frick was not a party to the easement agreement, and he did not have any obligations under the agreement. Specifically, the written easement agreement between ESKE and Sucher states that:
 {¶ 86} "[t]he Owners and any and all subsequent owners of all or part of the Properties shall at their own expense keep the Driveway Easement and Parking Easement in good condition and repair, ordinary wear and tear excepted. ESKE and Sucher shall each be responsible for half of the total cost of such maintenance and repair. The maintenance and repair shall include (but not be limited to) snow and ice removal, sweeping, paving, striping and repair, and maintenance and replacement of any lighting erected thereon. Notwithstanding the foregoing, if any Owner or other person for whom it is responsible shall cause any damage to the Driveway Easement or Parking Easement (rather than ordinary wear and tear), the Owner responsible shall pay for any repairs or replacements necessary to restore or replace the damaged portion of the Easement."
 {¶ 87} The easement agreement also specifically states that:
 {¶ 88} "for purposes of this Agreement, the term `Properties' shall mean the ESKE property, and Sucher Property, collectively. In addition, ESKE and Sucher shall be referred to collectively as the `Owners.'"
 {¶ 89} Since Frick was not a party to this agreement, and was not an "owner," he had no obligation regarding Sucher's property. Furthermore, any obligations for maintaining the lot were shared by the owners — ESKE and Sucher. The parking lot was also not ESKE's sole obligation, because Sucher was specifically required to share responsibility for maintenance and to share expenses. Futhermore, no one had an obligation to improve the lot or to improve Sucher's property.
 {¶ 90} Moreover, under Frick's own lease agreement with ESKE, Frick did not have any obligation to either maintain or improve the parking lot. Instead, Frick was simply required to pay for "half the total cost of the maintenance and repair of the Parking Easement and Driveway Easements (the full amount Landlord is responsible for.)" In other words, if the lot needed maintenance, Frick would pay ESKE's share of the expense and Sucher would still pay its own share.
 {¶ 91} In view of the preceding discussion, we find genuine issues of material fact concerning whether the application of the Statute of Frauds is barred by the doctrine of part performance. Frick raised this point in responding to summary judgment, and the trial court did not address the issue in its decision. Although we assume in such cases that the trial court intended to reject the argument, the court erred in doing so, because of the factual issues that exist.
 {¶ 92} The final issue to be addressed in this regard concerns Mrs. Sucher, who was a co-owner of the property. In an affidavit attached to the motion for summary judgment, Mrs. Sucher claimed that she never gave her husband authority to execute agreements on her behalf concerning the property. Mrs. Sucher also said she would never have agreed to enter into an agreement that restricted her right to build in the easement. Based on these facts, Sucher argued in the trial court that Frick's claim was barred because he did not show any agreement or promise from Mrs. Sucher. In granting summary judgment, the trial court did not address this issue.
 {¶ 93} As support for their claim, the Suchers rely on the case ofGleason v. Squires (1931), 39 Ohio App. 88, which involved a husband and wife who were co-owners of property. For many years, the husband and wife used a lane for ingress and egress to their land, pursuant to an easement that had been in effect for about ninety years. Id. at 88-89. The husband agreed with the adjoining property owner to purchase a gate and put it across the entrance to the lane. However, when the husband told his wife about the plans, she refused to agree, because the gate would be hard for their small children to open. The children would also have to walk through an enclosed area where cattle was kept. Id. at 89. Consequently, the husband and wife brought an action for injunction against the adjoining property owners to keep them from erecting a gate.
 {¶ 94} On appeal of a judgment granted to the defendant, the Fifth District Court of Appeals reversed and granted the injunction. The court indicated that it did not believe that:
 {¶ 95} "one cotenant can bind the other in an agreement which would make ingress and egress to and from their property more difficult; which by so doing might thereby lessen the value of their property. And it might be noted in the instant case that, if the defendants were permitted to erect and maintain the gate in question, after the lapse of the statutory period they might thereby gain title to the strip of land over which the plaintiffs now have their easement, and thereby by the lapse of time acquire title to said easement to the prejudice of the plaintiffs herein." Id. at 91.
 {¶ 96} Unlike the present case, Gleason did not involve the doctrine of part performance. There was also no indication that the alleged restriction on expansion would lessen the value of Sucher's property. However, even if these facts were otherwise, Gleason is not helpful because it did not address the issue of agency. Specifically, there is no indication in Gleason that the husband of the co-owner had express or implied authority to make agreements and decisions about the property. In contrast, there are genuine issues of material fact in the present case concerning whether Mr. Sucher had authority, based on actual agency, to make decisions and agreements about the property that would bind his wife. Notably, this conflict in facts arises through Mr. and Mrs. Sucher's own testimony.
 {¶ 97} "An agency relationship is not presumed between husband and wife simply based upon their marital relationship. * * * However, an agency relationship may be created either by an express grant of authority, by implication, or by agency by estoppel." McSweeney v.Jackson (1996), 117 Ohio App.3d 623, 630. "Actual agency * * * occurs where there is a consensual relationship between the agent and principal." Gerace Flick v. Westfield Nat. Ins. Co., Columbiana App. No. 91CO45, 2002-Ohio-5222, ¶ 86. "Such actual agency may be informally created and the assent of the parties thereto may be either express or implied." Wisor v. Zimmerman (March 3, 1987), Athens App. No. 1304, 1987 WL 7226, *2. See, also, Damon's Missouri, Inc. v. Davis (1992),63 Ohio St.3d 605, 608 (a principle of agency is that "an agent, acting within the scope of his actual authority, expressly or impliedly conferred, can bind the principal"). Furthermore, "[t]hat an agency as a matter of law does not exist by virtue of marriage, does not preclude one spouse from being the agent of the other, as long as the authority to act is express, implied or subsequently ratified. * * * An agency may be conferred orally and may be proven by any competent evidence written or oral, direct or circumstantial." Group One Realty, Inc. v. Cooper (Nov. 23, 1993), Franklin App. No. 93APE08-1080, 1993 WL 485114, *1 (citation omitted).
 {¶ 98} Mr. Sucher's deposition was taken before the preliminary injunction hearing was held. During the deposition, Sucher was questioned extensively about the meetings and negotiations that took place in connection with the purchase of the property and about the alleged agreement with Frick. Mr. Sucher was also asked about his consultations with architects and construction companies regarding the proposed expansion. The deposition is devoid of any indication that Mrs. Sucher attended any of these meetings, negotiations, or consultations, or participated in any way in the decision-making process. In fact, she is mentioned in only two places during Mr. Sucher's deposition. At one point, Sucher stated, in response to a question about ownership, that he and his wife owned the land and the building. Later in the deposition, Sucher was asked if he had created any kind of business plan for expansion. Sucher initially said that he did not need to put together a plan. Then, while discussing why he rejected Sonnenberg's plan for expansion on the east side, Sucher said, "It was too much because I wouldn't put my family that far in debt." The following exchange then occurred:
 {¶ 99} "Q. Okay. But I guess my question is you didn't put together some kind of a business plan?
 {¶ 100} "A. In my mind I did. With my wife, we talked about it, but the fact is, it's my decision. I make all the decisions, and I just didn't want to put my family that far in debt."
 {¶ 101} Depositions were taken also of the architect who drew up plans in 1998 for the expansion, and of the builder whose bid was accepted for the expansion. Neither individual indicated that he met with Mrs. Sucher, or had discussions or meetings with anyone other than Mr. Sucher. In addition, neither individual indicated that anyone other than Mr. Sucher was involved in the decision-making process.
 {¶ 102} The preliminary injunction hearing was held in June, 1999, and lasted two days, generating about 797 pages of testimony. The witnesses testifying at the hearing included Ed Kress, Eric Sonnenberg, Ray Frick, Gary Sucher, and Chris DeAndre (Director of Operations for Fricker's Restaurants). During the entire hearing, none of the witnesses referred to Mrs. Sucher, other than at one point. This occurred when Mr. Sucher identified the parking easement agreement and stated that he and his wife had signed it. The rest of the testimony focused on discussions and meetings involving Kress, Sonnenberg, Frick, and Mr. Sucher, or some combination of those parties. The only other discussions mentioned in the testimony were those between Mr. Sucher and the various architects and builders he consulted.
 {¶ 103} During Mr. Sucher's testimony at the hearing, the following exchange occurred:
 {¶ 104} "Q. This easement is personal to you; isn't it?
 {¶ 105} "A. I'm — I believe so.
 {¶ 106} "Q. Well, what is your belief about the easement? How long does the easement last?
 {¶ 107} "* * *
 {¶ 108} "A. I understood it was a perpetual easement. That means it just goes on and on and on.
 {¶ 109} "Q. What you understand is your right to build in the easement. How long do you have the right to do that?
 {¶ 110} "A. As long as I own the property.
 {¶ 111} "Q. And once you don't own the property, it's your understanding you can't build there anymore?
 {¶ 112} "A. Yes, I believe that if I were to sell it and — and move, the next person would not have that right."
 {¶ 113} Sucher also testified in the injunction hearing about various bids he received for the expansion. In this regard, the following exchange occurred:
 {¶ 114} "Q. Okay. What about the next one?
 {¶ 115} "A. Uh . . . that's the one that — I accepted this. Included, uh . . . most everything. There was some little things left out — left outta this, but they were just extremely minor things. Uh . . . I like Al Butler very well and I think he's a good builder."
 {¶ 116} The documents submitted at the hearing are also consistent with Sucher's deposition testimony that he had actual authority to make all decisions regarding the property. For example, the application Sucher filed in 1998 with the Board of Zoning Appeals to obtain a variance for the expansion lists various information about the property, like the mailing address, location of use address, etc. Under "Name of Owner," the application states only: "Gregory D. Sucher." The design drawings prepared by Sucher's architect also list only "Gregory D. Sucher" as the owner. In addition, the rest of the documents, including correspondence from Kress before and after the purchase, from Sucher's own attorney, and from other parties about the proposed expansion, are addressed or are copied only to Greg Sucher, not to Mrs. Sucher. The sole exception is the easement agreement, which is signed by Mrs. Sucher.
 {¶ 117} In contrast to the above evidence is Mrs. Sucher's statement that she did not give her husband authority to execute agreements about the property. Based on the conflict in testimony, there are genuine issues of material fact regarding whether Greg Sucher had authority, based on actual agency, to bind Mrs. Sucher on decisions and promises concerning the property.
 {¶ 118} There are also potential issues as to agency by estoppel, under the theory that:
 {¶ 119} "`[w]here a principal has by his voluntary act placed an agent in such a situation that a person of ordinary prudence, conversant with business usages, and the nature of the particular business, is justified in assuming that such agent is authorized to perform on behalf of his principal a particular act, such particular act having been performed the principal is estopped as against such innocent third person from denying the agent's authority to perform it.'" Standen v. Smith,
Lorain App. No. 01CA007886, 2002-Ohio-760, 2002 WL 242105, *4, quoting from General Cartage Storage Co. v. Cox (1906), 74 Ohio St. 284,294.
 {¶ 120} Because material issues of fact exist concerning the part performance exception to the Statute of Frauds, and the actual authority of Gary Sucher to bind Mrs. Sucher to promises made about the property, the trial court erred in granting summary judgment on the claims asserted by Frick. As a result, the third assignment of error has merit and is sustained, insofar as it relates to any claims of Frick against Sucher and Vandalia Auto. The third assignment of error is overruled to the extent that it raises promissory estoppel as a barrier to the judgment against ESKE.
 {¶ 121} In light of the preceding discussion, the first and second assignments of error are overruled. The third assignment of error is overruled in part and is sustained in part. Accordingly, the trial court judgment is affirmed as to the summary judgment granted against ESKE, and is reversed and remanded for further proceedings with regard to Frick's claims against the Suchers and Vandalia Auto.
Fain, P.J., and Young, J., concur.