AVIATION SALES, INC., APPELLANT, *v.*
SELECT MOBILE HOMES ET AL.,
APPELLEES.

(No. 10744—Decided
July 20, 1988.)

*Dwight D. Brannon,* for appellant.
*Roy E. Leonard,* for appellees.

FAIN, J. Plaintiff-appellant Aviation Sales, Inc. appeals from a directed verdict in favor of defendants-appellees. Aviation Sales claims that the evidence it presented established genuine issues of material fact from which reasonable minds could reach different conclusions, and that the trial court erred, as a matter of law, in concluding that Aviation Sales' mistake in calculating the sales price of an airplane was not sufficient to give rise to the equitable remedy of rescission, or to a recovery under the theory of unjust enrichment.

We conclude that the evidence in the record in this case, when viewed in a light most favorable to Aviation Sales, establishes that Aviation Sales made a mistake in computing the sales price of its airplane, and supports an inference that defendant-appellee Select Mobile Homes ("SMH") was well aware of this miscalculation when the purchase and sale were closed. We conclude that these facts may entitle Aviation Sales to the equitable remedy of restitution.

I

Aviation Sales had acquired a Cessna 421 airplane that it advertised for sale at a price of $159,000. A representative of SMH expressed interest in the airplane. Richard Penwell, a sales manager for Aviation Sales, told SMH's representative that the airplane could be sold for $155,000. In subsequent negotiations, the price was further reduced to $150,000.

A few days later, David L. Schuehrer, the president of SMH, telephoned Penwell to discuss the airplane. Schuehrer said that he had a Cessna 210 that he would like to trade for the Cessna 421. Penwell said that the Cessna 210 would probably have a trade-in value of about $30,000, but that he would have to evaluate it before he could quote a final figure.

The next day, Penwell flew the Cessna 421 to Flint Michigan, the home of SMH, and Schuehrer and other representatives of SMH inspected the 421, while Penwell examined the proposed trade-in. Penwell said that he could credit the Cessna 210 for only $27,000 because the log books for the first two hundred hours of its flight were missing. At this time, Schuehrer, on behalf of SMH, gave Penwell, on behalf of Aviation Sales, a check for $10,000 as a deposit on the Cessna 421. Also at this time, it was disclosed that there was money owing on the Cessna 210 that would have to be paid off as part of the transaction. However, the amount of the payoff figure was not known at this time.

Later, Penwell called the Cessna Finance Company and determined that the payoff figure on the Cessna 210 was $34,057. Penwell then calculated the cash price that SMH would need to pay. Unfortunately, his calculation was flawed.

Penwell had already calculated that the selling price of the Cessna 421, less the trade-in value of the Cessna 210, was $123,000 ($150,000 minus $27,000). He then calculated the difference between the payoff figure on the Cessna 210 and its trade-in allowance as being $7,057 ($34,057 minus $27,000). He then added the amount by which the payoff figure exceeded the trade-in allowance, $7,057, to the previously calculated difference between the selling price of the Cessna 421 and the trade-in value of the Cessna 210. The total was $130,057 ($7,057 plus $123,000). Unfortunately, this calculation was fundamentally flawed in that Penwell credited SMH with the value of the Cessna 210 twice, once as a subtraction from the selling price of the Cessna 421, and once as a subtraction from the payoff figure on the Cessna 210. Thus, Penwell undercalculated the cash component of the price of the Cessna 421 by $27,000.

After he had miscalculated the cash component of the selling price, Penwell contacted Schuehrer and told him that the cash price would be $130,057.

Three days later, Penwell flew the Cessna 421 to Flint, Michigan, to complete the transaction. Penwell gave Schuehrer back the $10,000 deposit check and accepted a check in the amount of $130,057, the amount of the cash component of the sales price that had previously been quoted to SMH. Penwell left the Cessna 421 in Michigan, and returned to Dayton with the trade-in Cessna 210.

At the closing of the transaction in Flint, Michigan, Penwell, on behalf of Aviation Sales, and Schuehrer, on behalf of SMH, executed the following document:

"June 21, 1986.

"For the sum of $130,057.00 cash in hand and the trade in of a Cessna 761DH serial #21062170 Model #T210M as is, with all faults of which Aviation Sales will assume and pay off on a timely basis the owed amount of $34,057.00 to Cessna Finance Corporation, PO Box 308, Wichita, KA 67201. Select Mobile Homes of Flint, Inc. will receive a clear and unencumbered title to a 1976 C-421 serial #421C0120 model #421C aircraft. N-811VQ"

A few days later, after he had deposited the check and advised the bank to pay off the encumbrances on both airplanes, Penwell was contacted by the bank and informed that there was a $27,000 shortfall. At this point, Penwell realized his mistake, and attempted to contact SMH.

Eventually, the president of Aviation Sales was able to contact Schuehrer and explain the mistake. Schuehrer said that he would check his records. A few days later, Penwell flew back to Flint. During this visit, Penwell obtained the log books of the Cessna 421, and met with a representative of SMH, who advised him that SMH did not intend to pay any more money for the airplane. The position of SMH was that Aviation Sales had simply made a mistake, and would have to live with it.

Penwell admitted at trial that he had a dual purpose in obtaining the log books of the Cessna 421. It was necessary and appropriate to update the log books to reflect the fact that the airplane had just been re-inspected, and this was done. It was also evidently Penwell's thought that Aviation Sales might retain possession of the log books until the matter had been resolved to its satisfaction. However, after Aviation Sales consulted with its attorney concerning the matter, the log books, updated, were returned to SMH.

Aviation Sales brought this action against SMH and its president seeking either to recover an additional $27,000

as part of the purchase price, or to rescind the transaction. The matter was tried to a jury, but, at the conclusion of the plaintiff's case, the defendants' motion for a directed verdict was granted. From the judgment in favor of the defendants, Aviation Sales appeals.

## II

Aviation Sales has set forth three assignments of error, as follows:

"First Assignment of Error

"The lower court erred as a matter of fact in granting the defendants' motion for directed verdict on plaintiff Aviation Sales' entire complaint since the plaintiff's evidence established essential facts and issues from which reasonable minds could, and may reach different conclusions.

"Second Assignment of Error

"The lower court erred in its application of Ohio law in finding that plaintiff Aviation Sales was precluded from recovery due to its mistake where the evidence established the existence of a mutual and/or unilateral mistake of the type entitled to rescission and consequently restitution.

"Third Assignment of Error

"The lower court erred in its application of Ohio law in concluding that plaintiff failed to establish its unjust enrichment claim where the evidence established that in equity and justice appellees were unjustly enriched."

It is clear from the record that Aviation Sales made a $27,000 mistake in computing the sales price of its airplane, as a result of having twice deducted $27,000 as the amount of the trade-in allowance for the airplane received in trade. When the evidence is viewed in a light most favorable to Aviation Sales, it is a reasonable inference that SMH was aware of this mistake, but said nothing to bring the mistake to the attention of Aviation Sales, when the purchase and sale were closed.

In support of its assignments of error, Aviation Sales argues that it was the victim of fraud, or that there was a mutual or unilateral mistake of fact.

There is nothing in the record to support a claim of fraud. Fraud requires a misrepresentation by the tortfeasor, and SMH made no representations that were false. The problem was caused solely by a miscalculation on the part of Aviation Sales' sales manager in computing the selling price.

The mistake in this case was not a mutual mistake. In *Ohio Co.* v. *Rosemeier* (1972), 32 Ohio App. 2d 116, 61 O.O. 2d 105, 288 N.E. 2d 326, the case cited by Aviation Sales, both parties were mistaken as to the identity of the corporation whose shares of stock were being sold, as a result of which the defendant in that case was paid far more than the value of the shares of stock that she was actually selling.

In the case before us, the mistake was purely unilateral.

The subject of unilateral mistake is addressed in 1 Restatement of the Law 2d, Contracts (1981) 394, Section 153, as follows:

"§ 153. When Mistake of One Party Makes a Contract Voidable.

"Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and

"(a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or

"(b) the other party had reason to know of the mistake or his fault caused the mistake."

Unless the mistaken party must

bear the risk of the mistake pursuant to Section 154, a contract is voidable if one party made a mistake at the time that contract was entered into, the mistake had a material effect on the agreed exchange of performances that was adverse to the mistaken party, and the other party had reason to know of the mistake.

When the evidence in this case is viewed in a light most favorable to Aviation Sales, a reasonable mind could find that each of the necessary elements for voidability pursuant to Section 153 of the Restatement was proven.

Section 154 provides as follows:

"§ 154. When a Party Bears the Risk of a Mistake.

"A party bears the risk of a mistake when

"(a) the risk is allocated to him by agreement of the parties, or

"(b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or

"(c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so."

Subsections (a) and (b) would seem to have no application in the case before us. Subsection (c) is evidently a catchall provision intended to permit a court to allocate the risk of a mistake to the party who makes the mistake if, under the totality of the circumstances, it would be more equitable or reasonable to do so. In the case before us, it does not appear that the trial court found from all of the circumstances that it would be more equitable or reasonable to allocate to Aviation Sales the risk of its mistake in calculating the selling price. Although the court's judgment entry is not especially informative, it appears from

the context — a directed verdict at the close of the plaintiff's case — that the trial court simply concluded that on these facts it was required, as a matter of law, and without weighing the equities, to enter judgment for the defendants.

Although the relief available in the case of a unilateral mistake as described in Section 158 includes restitution (that is, a restoration of the *status quo ante*), it may also include further relief "on such terms as justice requires including protection of the parties' reliance interests." 1 Restatement of the Law 2d, Contracts (1981) 419, Section 158. The comments to Section 158 suggest that there may be cases in which it will not be possible to restore the *status quo ante* completely, and that in such cases it may be necessary to order more than a simple restitution in order to bring about the equivalent of restoring the parties to the position they were each in before the transaction. This may be such a case, since the airplane sold by Aviation Sales may have depreciated substantially in value since the date of the sale.

Cases in which a party's mistake arises in the integration of the bargain into a written contract, such as this case, tend to be close and difficult, especially where the mistake does not encompass a misunderstanding of the terms used in the written contract. See Palmer, Mistake and Unjust Enrichment (1962), at 74-78. Where, as here, both parties share a common understanding of the words used in the contract, but one party's miscalculation, of which the other party has actual or constructive knowledge, has led to a different written contract from the one that the mistaken party intended to enter into, it is difficult, if not impossible, to adopt a universal rule. It is not surprising, therefore, that none of the cases cited by the parties in their briefs really fits the facts of this case.

There is an obvious danger inherent in permitting a seller to avoid a sale by claiming that the selling price reflected in the written contract was the product of a miscalculation of which the purchaser had knowledge. In order for relief to be appropriate in such a case, it must be clear that:

(i) the price had been negotiated to the satisfaction of both parties before the miscalculation occurred;

(ii) the seller miscalculated the price as reflected in the written contract;

(iii) the purchaser recognized and appreciated the seller's miscalculation, but did nothing to bring it to the seller's attention; and

(iv) the seller relied, to his detriment, upon the negotiated price rather than upon the miscalculated price.

Another factor that should be considered is whether the purchaser relied upon the miscalculated price in deciding to commit himself to the transaction. In the case before us, it seems unlikely that the purchaser relied upon the miscalculation in deciding to go ahead with the closing, since it had already given the seller a deposit in the amount of $10,000, based on the pre-miscalculation, negotiated price.

Since the principal remedy available under the facts of this case — restitution — was an equitable remedy, the trial court conceivably might have withdrawn this case from the jury and itself served as the finder of fact. However, the context of this appeal is a directed verdict granted at the close of the plaintiff's case. The judgment entry clearly reflects that the trial court applied the tests for a directed verdict contained in Civ. R. 50(A). In that context, the evidence must be viewed in a light most favorable to the plaintiff, and the directed verdict can be affirmed only if reasonable minds could come only to the conclusion that the plaintiff failed to prove a set of facts entitling it to relief. See 5 Ohio Jurisprudence 3d (1978) 144-146, Appellate Review, Section 579.

Upon the record in this case, we cannot say, as a matter of law, that Aviation Sales failed to prove a set of facts entitling it to restitution and possibly additional relief intended to restore the *status quo ante* or its equitable equivalent.

### III

Aviation Sales' assignments of error are sustained to the extent that we conclude that there were genuine issues of material fact precluding a directed verdict. The judgment of the trial court is reversed, and this cause is remanded for further proceedings consistent with this opinion.

*Judgment reversed and cause remanded.*

KERNS, P.J., and BROGAN, J., concur.