OPINION
{¶ 1} Appellant, Budzar Industries, Inc. ("Budzar"), appeals from the May 11, 2004 judgment entry of the Lake County Court of Common Pleas, granting the motions for summary judgment of appellee, Robert Weber ("Weber").
 {¶ 2} On June 10, 2002, Weber filed a complaint against Budzar for breach of contract. On August 19, 2002, Budzar filed an answer. On February 18, 2003, Weber filed two motions for summary judgment, pursuant to Civ. R. 56, on its breach of contract claims and on defendant's counterclaims. Also on February 18, 2003, Budzar filed a motion for summary judgment in its favor on all claims asserted against it and on its counterclaim. On March 21, 2003, Weber filed a brief in opposition to Budzar's motion for summary judgment. Also on March 21, 2003, Budzar filed briefs in opposition to Weber's motions for summary judgment.
 {¶ 3} Weber was a sales manager for Budzar, a company specializing in the production and sale of process fluid heat transfer systems. On December 17, 1992, Weber and Budzar entered into a Stock Option Agreement ("Option Agreement"), which permitted Weber to acquire 344 shares of Budzar common stock. The Option Agreement provided that the issuance of the shares was contingent on Weber signing a Share Transfer Restriction Agreement ("Restriction Agreement"). Weber signed the Restriction Agreement on December 17, 1992, which contained terms in Section 2.2 allowing Budzar to repurchase all of Weber's shares if his employment was terminated. Section 3.1 contained the repurchase installment payment plan, and a provision requiring Budzar to provide a promissory note to secure the payments. A formula for determining the repurchase price ("Agreement Price"), contained in Exhibit 1 to the Restriction Agreement, involved paying Weber one hundred-twenty percent of his proportionate amount of the company's "shareholder's equity," calculated using Budzar's balance sheet for the most recently ended fiscal year prior to the making of the determination. The Restriction Agreement also contained a noncompetition provision, which lasted for two years following termination.
 {¶ 4} Beginning in 1993, Weber exercised his stock options until he had acquired all 344 shares. On July 30, 1999, Weber was terminated from Budzar. On that same day, via notice to Weber in an office memo, Budzar exercised its option to repurchase Weber's shares. The memo recognized Weber's ownership of 344 shares and set the July 30 formula price at $410.07 per share, for an approximate total value of $141,064.08. The memo noted that the final "slightly lower" price would be fixed with the publication of the July 1999 financial statement (which Budzar used to make the calculation rather than the required 1998 year-end balance sheet). The memo also provided that the first payment — twenty-five percent of the total payment — would be paid on August 30, 1999, and the balance would be paid in six bi-annual installments beginning in February 2000, and ending in August 2002, as required by the Restriction Agreement. The memo further reminded Weber of his noncompetiton obligation.
 {¶ 5} Upon publication of Budzar's July 1999 financial statements, Budzar determined that the value of Weber's shares was $139,463. Budzar made the initial twenty-five percent payment of $38,209.76, but failed to provide a promissory note. Budzar also made two subsequent payments of $19,103.38 in February 2000, and in August 2000. Budzar failed to make the scheduled payment in February 2001, and by letter dated March 15, 2001, David Young ("Young"), President of Budzar, informed Weber of the following:
 {¶ 6} "I have just received the amended tax return for 1999. This return includes balance sheet information that identifies the true value of your Budzar stock at the time the buy back took place. * * *
 {¶ 7} "The stock buy back took place on July 30, 1999. It is now clear that at that time Budzar had a negative net worth. We have not recast monthly financial statements but the net worth of Budzar at the end of 1998 was * * * -$1,020,323. The company lost an additional $111,288 in 1999 to end the year with a net worth of — $1,131,611. This means that the value of your stock at the time of the buy back was worthless. This means that the stock buy back is concluded and you will receive no further payments for your stock from Budzar. It further means that Budzar paid you $73,073.41 in error."
 {¶ 8} Weber never received the final four payments under the installment plan.
 {¶ 9} Young claimed, in an affidavit dated February 12, 2003, that in September 2000, he discovered that Budzar's controller had produced fraudulent financial statements indicating that Budzar's retained earnings (shareholders' equity) at the end of 1998 were $2,337,631, whereas the amended returns for 1998, prepared in March 2001, showed a negative retained earnings at the end of 1998, of -$1,020,323. Thus, he concluded that according to the formula for calculating the Agreement Price, Weber's shares were worthless at the time of the buy back, whereupon he sent the March 2000 letter to Weber. He also claimed that he demanded Weber to return the money it paid to him.
 {¶ 10} In Weber's affidavit dated February 17, 2003, he stated that he did not prepare or assist in preparing the company's financial statements, nor did he calculate or assist in calculating the Agreement Price of its 344 shares. Weber further stated that he accepted Budzar's payments in good faith, and that he changed his financial position, in complying with the noncompetition provision, by accepting employment at a forty percent salary reduction. He did not return the payments he had received from Budzar.
 {¶ 11} Weber filed a complaint against Budzar for breach of contract for (1) failing to provide the promissory note, (2) anticipatory breach, and (3) failing to make scheduled installment payments under the Restriction Agreement. Budzar's answer contained, inter alia, the defense of mutual mistake, and counterclaims for restitution, conversion, and unjust enrichment.
 {¶ 12} Pursuant to its May 11, 2004 judgment entry, the trial court granted Weber's motions for summary judgment, denied Budzar's summary judgment motion, and ordered Budzar to pay the final four installment payments of $19,103.78 each, plus interest. It is from that judgment that Budzar filed a timely notice of appeal and raises the following assignments of error:
 {¶ 13} "[1.] The trial court erred in granting summary judgment on [Weber's] [c]omplaint in favor of [Weber] and against [Budzar].
 {¶ 14} "[2.] The trial court erred in granting summary judgment on [Budzar's] [c]ounterclaim in favor of [Weber] and against [Budzar]."
 {¶ 15} In its first assignment of error, Budzar argues that the trial court erred in granting Weber's motion for summary judgment because Budzar had no contractual obligation to pay Weber any additional funds in connection with the repurchase of Weber's shares. It alleges that the Restriction Agreement governs its obligations, which required that Weber's shares be valued using a balance sheet prepared in accordance with generally accepted accounting principles, in a manner consistent with prior accounting periods. Since the balance sheet it relied upon in making the share valuation was fraudulent and did not reflect the true financial condition of the company, Budzar contends that it was proper to disregard them in favor of the numbers in the amended tax return.
 {¶ 16} Budzar further alleges that the trial court improperly applied the doctrine of unilateral mistake, which applies to mistakes occurring at the formation of the contract, rather than at the time of performance. Since the mistake in the calculation of the Agreement Price took place six years after the Restriction Agreement was executed, Budzar claimed it was a mistake in the performance of the contract, and, therefore, the doctrine of unilateral mistake was inapplicable.
 {¶ 17} An appellate court reviews a trial court's decision on a motion for summary judgment de novo. Grafton v. Ohio Edison Co. (1996),77 Ohio St.3d 102, 105; Kruppa v. All Souls Cemetery of the Diocese ofYoungstown (Feb. 22, 2002), 11th Dist. No 2001-T-0029, 2002 Ohio App. LEXIS 773, at 6.
 {¶ 18} In order for a summary judgment to be granted, the moving party must prove:
 {¶ 19} "* * * (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made." Mootispaw v. Eckstein
(1996), 76 Ohio St.3d 383, 385.
 {¶ 20} The Supreme Court stated in Dresher v. Burt (1996),75 Ohio St.3d 280, 296, that:
 {¶ 21} "* * * the moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifyingthose portions of the record which demonstrate the absence of a genuineissue of fact on a material element of the nonmoving party's claim. The `portions of the record' to which we refer are those evidentiary materials listed in Civ. R. 56(C), such as the pleadings, depositions, answers to interrogatories, etc., that have been filed in the case. * * *" (Emphasis sic.)
 {¶ 22} The contract provision that would govern Budzar's share repurchase obligations is described in Section 2.2 of the Restriction Agreement, which provides in pertinent part:
 {¶ 23} "If the employment of a Shareholder is terminated by the Company without cause * * *, then upon such termination, the Shares then owned by such Shareholder shall be deemed offered to the Company for purchase by it, and the Company shall have the option to purchase all, but not less than all, of the Shares. If the Company desires to purchase all of the Shares, it shall give written notice to that effect to a Shareholder within thirty (30) days of the termination of employment, and upon the giving of such notice, a purchase and sale agreement shall be deemed to have been created between the Company, as purchaser, and the Shareholder * * *, providing for the purchase of all of the Shares at the Agreement Price per share as defined in Exhibit 1 attached hereto, and upon such additional terms and provisions set forth in Section 3 below. The consummation of a purchase and sale pursuant to this Section 2.2, shall occur not later than sixty (60) days following the receipt by the Shareholder of such written notice from the Company. * * *" (Emphasis added.)
 {¶ 24} Thus, when Budzar gave notice to Weber on July 30, 1999, of the share repurchase, this new purchase and sale agreement ("Purchase/Sale Agreement") was created on that date, which governed the parties' rights and obligations for the repurchase. The Agreement Price for the shares was defined in Exhibit 1 as follows:
 {¶ 25} "The Agreement Price per Share shall be 120% of the proportionate amount of the Company's `shareholders' equity' allocable to each Share, determined using the Company's regularly prepared balance sheet for the most recently ended fiscal year immediately preceding the date as of which such determination is made, which balance sheet shall be prepared in accordance with generally accepted accounting principles in a manner consistent with prior accounting periods. * * *"
 {¶ 26} Sections 3.1 and 3.2 set out the installment payment terms, and Weber's obligation to tender the share certificates at the repurchase, respectively.
 {¶ 27} At the time the Purchase/Sale Agreement was created, Budzar provided, in the July 30, 1999 memo, a calculated Agreement Price of $141,064.08. Although the memo explained that the final "slightly lower" price would be fixed at the time the July financial statement was published, the fact of this subsequent calculation of $139,463.00 does not defeat the timing of the pricing. A contract includes not only the terms set forth in express words, but also all implied provisions indispensable to effectuate the intentions of the parties and carry out the contract.Sacramento Navigation Co. v. Salz (1927), 273 U.S. 326, 329; Williams v.Goodyear Aircraft Corp. (1948), 84 Ohio App. 113, 117-118. Here, the parties intended that the repurchase occur quickly. The Restriction Agreement required that it occur no later than sixty days after Budzar's notice to purchase. The notice was provided on July 30, 1999. Budzar's March 2001 letter stated that the buy back also took place on July 30, 1999. The first payment, according to Young's affidavit, was made in August 2000. Therefore, the $139,463.00 purchase price was indispensable to effectuate the intentions of the parties, and was thus impliedly part of the Purchase/Sale Agreement at the time it was created.
 {¶ 28} Budzar essentially argues that because the contract formula requires that the repurchase calculation be done using balance sheets prepared "in accordance with generally accepted accounting principles in a manner consistent with prior accounting periods," and further because the financial statement Budzar relied upon in making the formulaic price calculation was fraudulently prepared by its controller and, therefore, not in compliance with this contract requirement, the $139,463 price calculation was a mistake that resulted in an overpayment. Budzar further argues that this mistake is neither a mutual mistake nor a unilateral mistake occurring during the formation of the contract, but instead a mistake that took place during the performance of the contract; hence, the trial court's application of the doctrine of unilateral mistake was incorrect.
 {¶ 29} Budzar offers ITT World Directories, Inc. v. CIA. Editorial DeListas, S.A. (1975), 525 F.2d 697, as directly on point for this issue. In ITT, the Second Circuit upheld the trial court's dismissal of a complaint seeking restitution of a claimed mistaken overpayment made by the buyer of two corporations. In addition to a cash purchase price (which was not in dispute), the buyer was to make an "adjusting payment" based upon the combined tangible net worth of the corporations, as computed by Arthur Anderson Co. ("Anderson") according to a formula set forth in the agreement. The dispute did not arise from the application of the formula, but instead from the two "exceptions" that Anderson noted in its audit, which if accepted as true, would significantly reduce the combined tangible net worth. The seller objected to the two exceptions, and the Buyer, with full knowledge of the exceptions, paid the computed combined tangible net worth. A year and a half later, the buyer asserted that it had made a mistaken overpayment by not deducting the two exceptions. The circuit court agreed that the mistake, if any, was made in the performance of the contract, but then went on to affirm the trial court, finding that the overpayment may well have been the result of a conscious decision to avoid negotiation and arbitration, rather than a mistake.
 {¶ 30} Budzar's reliance on ITT is unfounded since we find it easily distinguishable from the present case. There are clear factual differences: in ITT, the dispute was unrelated to the use of the formula, and the parties knew of the contested matter prior to the payment of the purchase price. Moreover, it was reasonable for the court to find that the alleged mistake would have been in the performance of the contract. First, the determination of the companies' tangible net worth was contracted out to a third party, to be performed after the contract was executed. Second, the purchase price was not tendered until three and a half months after the contract execution, subsequent to the parties' reviews of, and discussions regarding, the audit reports.
 {¶ 31} In this case, the calculation of the Agreement Price occurred at the creation of the Purchase/Sale Agreement. Therefore, because any calculation error would have been at this stage and not during the performance stage, the trial court was correct in analyzing the mistake using the doctrines of mutual and unilateral mistake.
 {¶ 32} Budzar also claims that because there was a calculation mistake, the Agreement Price must be recalculated using the correct financial information reflected in the amended tax return, in order to comply with the formula in Exhibit 1. Budzar contends that when such a modification is performed, Weber's shares are worthless, and Budzar has no obligation to pay the last four installment payments.
 {¶ 33} In certain exceptional situations, parties to a contract can avoid contract liabilities through rescission or reformation of the contract on the ground of mistake. A mistake is a belief that is not in accord with the facts. 1 Restatement of the Law 2d, Contracts (1981) 383, § 151. The erroneous belief must relate to the facts as they exist at the time of the making of the contract. Id., comment a.
 {¶ 34} The doctrine of mutual mistake permits rescission of a contract when the parties' agreement is based upon a mutual mistake of either law or fact. State ex rel. Walker v. Lancaster City School Dist. Bd. of Edn.
(1997), 79 Ohio St.3d 216, 220. A mutual mistake is a mistake by both parties at the time the contract was made as to a basic assumption on which the contract was made, which has a material effect on the agreed exchange of performances. Reilley v. Richards (1994), 69 Ohio St.3d 352,353; 1 Restatement of the Law 2d, Contracts (1981) 385, § 152(1).
 {¶ 35} In the present case, the trial court found that both parties were mistaken as to the value of the shares. This court disagrees. At the time the Purchase/Sale Agreement was created, the parties contemplated, as evidenced in Exhibit 1, that the purchase price would be calculated using the balance sheet for the fiscal year immediately proceeding the determination, which would have been the 1998 year-end balance sheet. In other words, the balance sheet would have already been in existence at that time. There were no provisions in the Restriction Agreement or the Purchase/Sale Agreement permitting a revision or amendment of that balance sheet based on a later audit or review. Although Budzar chose to use the July 1999 financial statement instead of the 1998 year-end balance sheet, the parties nonetheless were not mutually mistaken as to their basic assumption about what financial record would be used. Therefore, they did not make a mutual mistake as to the value of the shares based on that record.
 {¶ 36} Likewise, the parties did not make a mutual mistake in the preparation of an accurate financial statement. Budzar is adamant that Exhibit 1 requires that the balance sheet be "prepared in accordance with general accepted accounting principles." While that is true, Weber did not prepare, or assist in preparing, the financial statement. On the other hand, Budzar admits that its controller produced the fraudulent financial statement, and Budzar has not claimed that the controller was not its agent at the time. Therefore, its subsequent discovery in September 2000, that it had prepared a faulty financial statement, did not involve a mistake that was shared by Weber.
 {¶ 37} A contract can be voided for unilateral mistake if: (1) one party made a mistake at the time a contract was made as to a basic assumption on which he made the contract, (2) that mistake has a material effect on the agreed exchange of performances that is adverse to him, and (3) he does not bear the risk of the mistake. Aviation Sales, Inc. v.Select Mobile Homes (1988), 48 Ohio App.3d 90, 93-94, citing 1 Restatement of the Law 2d, Contracts (1981) 394, § 153.
 {¶ 38} In addition, it must be shown either that the effect of the mistake is such that enforcement of the contract would be unconscionable, or that the other party had reason to know of the mistake or his fault caused the mistake. Id. Moreover, relief for unilateral mistake will not be granted where the mistake is the result of the negligence of the party seeking relief. Convenient Food Mart, Inc. v.Con., Inc. (Sept. 30, 1996), 11th Dist. No. 95-L-093, 1996 Ohio App. LEXIS 4338, at 13-14. See, also, Marshall v. Beach (2001),143 Ohio App.3d 432, 437 (following Convenient Food Mart, Inc.)
 {¶ 39} Budzar meets the first two requirements necessary to void a unilateral mistake. When Budzar calculated the Agreement Price, it was mistaken in assuming it had prepared an accurate financial statement. This error certainly had a material effect on its performance obligation to pay Weber $139,465.
 {¶ 40} However, Budzar is unable to show that it did not bear the risk of that mistake. A mistaken party must bear the risk of the mistake if: "`(a) the risk is allocated to him by agreement of the parties, or (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or (c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.'" Aviation Sales Inc., supra, at 94, quoting 1 Restatement of the Law 2d, Contracts (1981) 394, § 154.
 {¶ 41} We accept the trial court's allocation of the risk to Budzar on the ground that it was reasonable to do so because "Budzar was responsible for the preparation and accuracy of its financial statements. Those accounts were always in its possession. Weber had no duty to know the true status of Budzar's accounts and there is no evidence that he did anything to mislead Budzar about the true status of its accounts. Indeed, there is no evidence Weber had any way of discovering the incorrect financial information."
 {¶ 42} Moreover, there is no evidence that enforcement of the contract would be unconscionable. On the contrary, it would be unconscionable not to enforce it. Weber accepted the figures Budzar provided, even though Budzar used the July 1999 financial statement instead of the required 1998 year-end balance sheet. There is no evidence that Weber did not tender his 344 shares as required. Weber complied with the noncompetition clause for the required two-year period although it meant a reduction in his salary. Lastly, Budzar waited for over a year and a half before it notified Weber that there was an error in the financial statements at the time of the contract. Likewise, there is no evidence that Weber knew or should have known of this mistake. Budzar was not involved in either the preparation of the balance sheet or the calculation of the Agreement Price.
 {¶ 43} Finally, we concur with the trial court's finding that "the mistaken valuation of the shares of stock sold by Weber was due to Budzar's negligence." The Agreement Price was to be calculated using the company's balance sheet, which only Budzar was able to prepare and produce. It had a duty to prepare the balance sheet "in accordance with generally accepted accounting principles." By Budzar's own admission, it instead produced a fraudulent statement, albeit through its controller.
 {¶ 44} For the foregoing reasons, this court concludes that Budzar was contractually obligated under the Purchase/Sale Agreement to pay Weber the Agreement Price, and therefore Budzar's first assignment of error is without merit.
 {¶ 45} In its second assignment of error, Budzar claims that Weber is required to return the payments which Budzar paid to him based on its mistaken belief, at the time the Agreement Price was calculated, that the shareholder's equity was $2,337,631 when in fact there were negative retained earnings at that time. Budzar relies primarily on the Restatement of Law, Restitution (1937), § 20, which requires restitution when a person pays another an excessive amount of money because of an erroneous belief that such payment was necessary to discharge a contractual duty.
 {¶ 46} Based on our conclusion in Budzar's first assignment of error that it had a contractual duty to pay Weber, Budzar's second assignment of error also lacks merit.
 {¶ 47} For the foregoing reasons, Budzar's assignments of error are not well-taken. The judgment of the Lake County Court of Common Pleas is affirmed.
O'Neill, J., O'Toole, j., concur.