**ALLIED ERECTING & DISMANTLING COMPANY, Appellee,**

v.

**AUTO BALING COMPANY, Appellant.**

[Cite as *Allied Erecting & Dismantling Co. v. Auto Baling Co.* (1990), 69 Ohio App.3d 502.]

Court of Appeals of Ohio,
Trumbull County.

No. 89–T–4237.

Decided Sept. 24, 1990.

*Charles Dunlap,* for appellee.

*David Spector,* for appellant.

FORD, Judge.

Defendant-appellant, Auto Baling Company, appeals an April 25, 1989 judgment in favor of plaintiff-appellee, Allied Erecting & Dismantling Company, Inc., in the amount of $8,745 for breach of contract, and prejudgment interest on undisputed amounts settled prior to trial.

Appellant is engaged in the business of processing, storing and handling scrap iron. Appellee is a demolition company. In July 1982, the parties entered into an agreement involving the disposition of appellee's scrap metal. The parties dispute whether this contract was one for the sale of goods or one for services.

Under the July 1982 contract, appellee would deliver scrap metal to appellant, and appellant would defer payment until such time as the market supported the $30 per gross ton contract price. Appellant alleges this to be a sale. According to appellant, appellee, having no buyers and no physical storage ability, turned to appellant to purchase the scrap. In the depressed steel market of 1982, appellant contends that it was not then economically feasible for it to pay appellee for the scrap on delivery. Accordingly, the appellant contends that the deferred payment schedule enabled the appellee to sell its scrap, and allowed appellant to pay for it when buyers emerged.

Appellee alleges that it contracted with the appellant for its processing, storing, and procurement services. In essence, the appellee contends that appellant was under an obligation to process and keep separate appellee's scrap, and that once appellant found a buyer willing to pay more than $30 per gross ton, appellant should sell the scrap, pay appellee $30 per gross ton, and keep any excess for its trouble. The facts support this construction.

In July 1982, appellee began delivering scrap metal. The record indicates that appellant failed to find purchasers and consequently did not pay the appellee. Distressed with nonpayment, appellee contracted with Luria Brothers in March 1984. According to the terms of this agreement, Luria Brothers agreed to purchase four hundred gross tons of Number 2 grade scrap metal bundles in appellant's possession for $46.50 per gross ton.

Under the Allied–Luria agreement, the scrap was to be purchased by Luria Brothers and immediately resold to the Allegheny–Ludlum Corporation. The scrap was to be processed into bundles not exceeding 24" × 30" × 60", free of alloys, trash, wood, and other contaminants. Delivery was to be made directly to Allegheny–Ludlum via five Conrail railcars.

Appellant was informed of the Allied–Luria agreement, and was instructed to process the scrap to deliver to Allegheny–Ludlum. Since this altered the original procurement procedure, the parties modified the original agreement to reflect the change. In short, appellee agreed to pay appellant $20 per gross ton "for baling, handling, and storage of the bundles."

Because appellant had commingled appellee's scrap with other scrap and did not process the shipment pursuant to Allegheny–Ludlum specifications, the shipment was rejected as nonconforming. The rejected four-hundred-gross-ton shipment was returned to appellant, who refused to unload more than seventy of the four hundred gross tons. Appellant claimed it did not bear this risk of rejection. Appellant contends that appellee's payment of $20 per gross ton to appellant constitutes a "repurchase" of scrap and worked a novation of the original contract.

The record indicates that in the end result, appellant sold the off-loaded seventy tons to Sharon Steel for $45 or $50 a ton and agreed to pay appellee $30 per ton. The remaining three hundred thirty tons were sold by Conrail, purchased by Luria and resold to Sharon Steel. The record does not, however, establish at what price this scrap was sold or who received the proceeds of this sale by Conrail.

Appellee filed suit seeking damages for breach of contract and conversion. Appellant counterclaimed for breach of contract. The crux of the parties' positions can be summarized in two parts. Claims involving the three hundred thirty gross tons rejected by Allegheny–Ludlum, and claims involving other scrap delivered to appellant.

With regard to the parties' liability resulting from the three hundred thirty gross tons rejected by Allegheny–Ludlum, the trial court found the contract between the parties to be one for services. Appellant's commingling of the appellee's property constituted breach depriving appellee of the fair market value of his property. Appellee was awarded $15,345 ($46.50 × 330 gross tons). This amount was reduced by appellant's counterclaim for baling and storage fees totaling $6,600 ($20 × 330 gross tons). Accordingly, final judgment for appellee totaled $8,754.

With regard to the remaining tonnage (all materials other than the disputed three hundred thirty tons) delivered to appellants, prior to trial the parties stipulated to the sum of $15,254.95 as due and owing to appellee. The trial

court held this amount to be a liquidated and undisputed sum, and since appellant had no excuse for nonpayment, the trial court awarded prejudgment interest from April 15, 1984 to the date of judgment entry.

On appeal, appellant asserts the following assignments of error for review:

"1. The trial court erred in awarding interest to the stipulated sum of $15,254.95 because appellant agreed to pay this amount prior to trial in settlement of certain claims made by appellee.

"2. The trial court erred to the prejudice of appellant finding that the contract between the parties was for services as opposed to sale of goods."

Under the first assignment of error, appellant alleges that the trial court erred in awarding prejudgment interest on the stipulated sum of $15,254.95. This represents the amount due on various shipments of scrap metal delivered to appellant prior to April 15, 1984. This figure does not, however, include the three hundred thirty gross tons rejected by Allegheny–Ludlum and subsequently sold by Conrail. Appellant's argument asserts that under Ohio law, prejudgment interest does not attach to unliquidated sums that are settled prior to trial.

R.C. 1343.03(A) provides:

"(A) In cases other than those provided for in sections 1343.01 and 1343.02 of the Revised Code, when money becomes due and payable upon any bond, bill, note, or other instrument of writing, upon any book account, upon any settlement between parties, upon all verbal contracts entered into, and upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of tortious conduct or a contract or other transaction, the creditor is entitled to interest at the rate of ten per cent per annum, and no more, unless a written contract provides a different rate of interest in relation to the money that becomes due and payable, in which case the creditor is entitled to interest at the rate provided in that contract."

There are also provisions in R.C. 1343.03 for prejudgment interest applying to the failure to make a good faith effort to settle a tort claim which are inapplicable here.

In *Lewis v. Seiler* (Mar. 30, 1984), Trumbull App. No. 3300, unreported, 1984 WL 6304, the Eleventh District Court of Appeals upheld an award of prejudgment interest in a breach of contract action. The test recited remains, in essence, the test today.

"Revised Code § 1343.03(A) permits the award of interest. Where money becomes due on a contract, interest accrues from the time the money should have been paid. *Braverman v. Spriggs* (1980), 68 Ohio App.2d 58 [22 O.O.3d

47, 426 N.E.2d 526]. However, where the amount due is unliquidated, the interest runs from the date of the judgment. *Id.*

"In Ohio, prejudgment interest will not be denied where the money due is clearly based on contracts entered into by the parties. *Shaker Savings Assoc. v. Greenwood Village, Inc.* (1982), 7 Ohio App.3d 141 [7 OBR 184, 454 N.E.2d 984]. Neither will prejudgment interest be denied where the amount is capable of ascertainment by mere computation, or is subject to reasonably certain calculations. *Id.*, at 143 [7 OBR at 186, 454 N.E.2d at 986]."

▆ "A party's entitlement to prejudgment interest must turn, in major part, upon a determination as to whether the underlying debt is liquidated." *Nursing Staff of Cincinnati, Inc. v. Sherman* (1984), 13 Ohio App.3d 328, 330, 13 OBR 406, 409, 469 N.E.2d 1031, 1034. A debt is liquidated when the amount of the debt is clear and certain. *Id.*

▆ Appellant fails to offer any evidence to support its claim that the debt was unliquidated. While the parties did not set a definite date for payment, the evidence in the record establishes that the parties agreed that payments would begin when the market supports a $30 gross ton price.

As of April 15, 1984, the market supported the $30 contract price. This is evidenced by the Allied–Luria contract for $46.50 per gross ton.

Appellant's only conceivable argument is that the market, in general, could not have supported a $30 per gross ton price at that time. This, however, is not a dispute as to the amount of liability, but rather a denial of present liability. Accordingly, "[a] mere denial that one is [presently] liable for a debt that is otherwise clear and ascertainable is not sufficient to defeat a claim for prejudgment interest." *Id.* at 331, 13 OBR at 409, 469 N.E.2d at 1034 (citing *Braverman v. Spriggs* [1980], 68 Ohio App.2d 58, 60, 22 O.O.3d 47, 48, 426 N.E.2d 526, 527).

▆ It was altogether reasonable for the trial court to assume that the "market supported" the contract price, and that the obligation to pay had arisen by April 15, 1984. In *Austinburg Coop. Co. v. Dietrich* (Nov. 10, 1988), Ashtabula App. No. 1358, unreported, 1988 WL 121300, this court upheld an award of prejudgment interest pursuant to R.C. 1343.03(A) on an unpaid account which called for payment at "harvest time." This case is analogous in that the terms "market supports" and "harvest time" are similar with regard to the timing of the obligations to pay. In *Austinburg*, this court stated:

"Appellant further argues that the court erred in determining that the account was due and payable as of January 1, 1985. While the parties did not set a definite date for payment, they did agree that payment should be at

'harvest time.' Since the purchases were made during the calendar year 1984, it is not unreasonable to assume the account was to be paid as of 'harvest time' in the fall of 1984. Appellant was not prejudiced by the court's finding that the account was due on January 1, 1985."

In light of the foregoing analysis, appellant's first assignment is without merit.

■ Appellant's sole remaining assignment alleges the trial court erred to the prejudice of appellant finding the contract between the parties was for services as opposed to a contract for the sale of goods. The crux of appellant's argument is that the manifest weight of the evidence supports a contrary finding, and that appellee's repurchase of goods worked a novation relieving appellant of all liability for the risk of sale.

Article Two of the Uniform Commercial Code applies to transactions involving the sale of goods and does not apply to service contracts. R.C. 1302.01 *et seq.* In determining the applicability of Article Two sales provisions, Ohio courts have applied the predominant purpose test. See *Allied Indus. Serv. Corp. v. Kasle Iron & Metals* (1977), 62 Ohio App.2d 144, 16 O.O.3d 303, 405 N.E.2d 307. Under the test, the issue is "whether the predominant factor and purpose of the contract is the rendition of service, with goods incidentally involved, or whether the contract is for the sale of goods with labor incidentally involved." *Id.* at 147, 16 O.O.3d at 305, 405 N.E.2d at 310.

■ Although the language of the original July 1982 contract contains some language which could suggest an outright sale, the custom and course of dealings between the parties support the finding of a service contract. The simple facts are that appellant baled, processed, stored, and procured buyers for appellee. Only when a buyer was found did appellant forward payment to appellee and confirm the sale.

Perhaps the most conclusive evidence of a service contract involves the rejected Allegheny–Ludlum shipment. Why would appellee *negotiate* the sale with Luria Brothers when, if the facts were as appellant suggests, appellee could simply notify appellant of the market supporting the $46.50 price and demand payment? Moreover, why would appellant act pursuant to appellee's instructions to ship, and then submit an invoice to appellee for "baling, handling and storage of bundle as per the agreement?"

Clearly, some competent, credible evidence supports the trial court's finding of a service contract and, as such, it will not be reversed as against the

manifest weight of evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578.

For the foregoing reasons, the judgment of the trial court is affirmed.

*Judgment affirmed.*

MAHONEY, P.J., and PRYATEL, J., concur.

AUGUST PRYATEL, J., retired, of the Eighth Appellate District, sitting by assignment.