OPINION
{¶ 1} This case is before us on the appeal of Defendant, Craftsmen Home Improvement, Inc. (Craftsmen), from a trial court decision awarding $41,262.32 in damages to Plaintiffs, Fox and Lambreth Enterprises, Inc. (Fox Enterprises), and Daniel Fox. As a single assignment of error, Craftsmen claims that "the trial court erred in granting judgment to the Appellees." Craftsmen also lists nine "issues for review," but separates its discussion in the body of the brief into six "arguments," one of which contains four sub-parts. Due to this confusing format, we have elected to treat the six "arguments" as assignments of error.
 {¶ 2} After considering the assignments of error, the record, and the applicable law, we find that the judgment of the trial court should be affirmed. A discussion of the basis for our opinion follows.
 I. The Oral Agreement and Applicable Statute of Frauds {¶ 3} In the first "argument," Craftsmen contends that "an oral contract for the lease of property which includes attached fixtures and whose payment is not contemplated within one year violates R.C. § 1335.05 and R.C. § 1302.04." This particular argument is divided into four sub-parts, which all relate to the Statute of Frauds and to Craftsmen's position that exceptions to the Statute of Frauds cannot validate the oral contract that was involved in this case.
 A. Alleged Oral Contract for Lease of a Commercial Property {¶ 4} Craftsmen's first sub-argument is based on the theory that enforcement of any contract between Fox Enterprises and Craftsmen is precluded by R.C. 1335.05, which provides that:
 {¶ 5} "No action shall be brought whereby to * * * charge a person * * * upon a contract or sale of lands, tenements, or hereditaments, or interest in or concerning them, or upon an agreement that is not to be performed within one year from the making thereof; unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized."
 {¶ 6} According to Craftsmen, there were three separate contracts in this case, and the predominant purpose of all the contracts was a lease for property, which was unenforceable because it was oral. We disagree, because the evidence does not indicate that the parties intended to enter into a contract for a lease. In fact, none of the writings even mention a lease agreement.
 {¶ 7} The testimony in this case indicates that Daniel Fox had been self-employed in the kitchen and bathroom remodeling business since 1981. From 1985 through November, 1998, Fox owned Fox Enterprises, which did business as "A Better Kitchen Supply" (Better Kitchen). At all times relevant, Better Kitchen was located in a building at 3810 Dayton-Xenia Road that was leased from Carl and Bellulah Hussong. The front of the building was used for a showroom and offices, and the back was used for storage and shop fabrication for Better Kitchen's counter top and solid surface business. In the showroom were modular kitchen and bathroom displays that could be moved and changed. The displays were intricate and accessorized, including towel bars, soap dishes, wallpaper, and so forth, such that when customers walked in, they would feel like the display was their own kitchen or bathroom. Better Kitchen was very much an upscale business.
 {¶ 8} Craftsmen was also in the bath and kitchen business, but was less upscale, so they were not really a competitor of Better Kitchen. For about two years before 1998, Better Kitchen had done counter top fabrication for Craftsmen. Fox had been to Craftsmen's showroom and had seen its displays, which were nothing like what Better Kitchen had.
 {¶ 9} At all times relevant to this action, Craftsmen was owned by seven shareholders. The primary stockholders were Doug Readnower, Kevin McCloskey, and Ron Piatt, who were directors, and who each owned 25% of the stock. The remaining stock was owned by four other men — Doug Griffith, Sam Edwards, Doug Piatt, and Daryl Bieser, who each owned about 6% of the stock.
 {¶ 10} In September, 1998, Craftsmen heard that Fox was planning to close his business. Subsequently, both Ron Piatt and Doug Readnower checked out Better Kitchen's showroom, and Readnower then met with Fox. The first meeting was on September 17, 1998, and led to a series of meetings in September and October, during which Readnower, McCloskey, and Fox discussed the sale of the business.
 {¶ 11} Craftsmen was not interested in purchasing Fox's office equipment, shop material, or shop equipment, nor did Craftsmen want Fox's employees. Instead, Craftsmen was interested in the showroom assets. During one of the meetings, Readnower walked through the showroom and designated what he wanted. Based on this discussion, Fox made up a list of assets that were to be purchased, and set a price of $50,000. There were also discussions about Fox becoming a Craftsmen employee, doing either sales or fabrication. In addition, Fox agreed to give Craftsmen a list of his previous customers and to direct any future business to Craftsmen.
 {¶ 12} In a subsequent meeting, Fox told Readnower that he did not want to be part of Craftsmen, and that he did not think they were going to be able to do the deal. Readnower said he had met with the partners and that they had agreed to Fox's price. At a meeting in mid to late October with Readnower and McCloskey, the men shook hands on everything and Readnower said, "We've got a deal." The deal was for $50,000, with $20,000 to be paid up front on December 1, 1998, with the balance to be paid over 36 months, in equal payments.
 {¶ 13} Readnower subsequently dropped off two documents that he had prepared. Both documents were dated October 26, 1998. The first document was entitled "Bill of Sale," and included, as Exhibit A, the list of displays Fox had prepared. The bill of sale stated that Better Kitchen and Fox had agreed to sell Craftsmen the list of items in Exhibit A, for $20,000. The second document was entitled "Covenant Not to Compete," and indicated that in consideration of $30,000, payable in 36 monthly payments beginning on December 1, 1998, Fox would not compete with Craftsmen in the field of sales of kitchen or bathroom remodeling services in a five-county area.
 {¶ 14} There was no dispute that the parties valued the assets at $50,000, and that they did not discuss covenants not to compete before Readnower gave Fox the Bill of Sale and Covenant Not to Compete. Readnower said that he decided to structure the transaction in this manner because of tax advantages it would afford Craftsmen. When Fox received the documents, he rejected them because the covenant had not been discussed. The bill of sale also included a warranty that no liens existed, and Fox needed to obtain a release from his bank regarding a lien the bank had on his business assets. Fox testified that the lien was for equipment that was not part of the assets being sold. He also indicated that he was going to pay off the lien with the sale proceeds. Readnower testified that whether the liens were released or were paid was not a problem; Craftsmen simply wanted the liens taken care of. Furthermore, the parties had never discussed liens before Readnower gave Fox the Bill of Sale and Covenant Not to Compete.
 {¶ 15} Another written document was presented at trial. This document was dated October 28, 1998, was entitled "purchase agreement," and contained the same terms as the prior writings, except for changes in the covenant not to compete and in the lien clause. Although both sides denied creating this agreement, the magistrate and trial court found that Fox had prepared it. Readnower rejected the purchase agreement because he wanted the transaction written up in two separate documents. The purchase agreement also misspelled Craftsmen's name and incorrectly included the corporation (Better Kitchen) in the covenant not to compete. Readnower stated at trial that certain conditions in the covenant not to compete were also unacceptable. For example, the geographical distance had been decreased to ten miles. The lien provision was also different.
 {¶ 16} At trial, Readnower and McCloskey both testified that they were not simply interested in buying fixtures, and that they told Fox that no deal could be struck unless they obtained a satisfactory lease for the building. However, none of the written documents mentioned anything about a lease. Readnower additionally testified that Craftsmen valued the assets at $50,000 only because of their location in the leased premises. However, the magistrate and trial court apparently did not find this testimony credible.
 {¶ 17} On October 19, 1998, Fox took Readnower and McCloskey to meet the Hussongs. Fox testified that this occurred after the parties had a deal, while Readnower and McCloskey denied that a deal ever existed. Fox testified that there were no negotiations about a lease at any of the meetings that he had with Craftsmen. When Fox introduced Readnower and McCloskey, Fox told the Hussongs that Craftsmen was going to purchase his business and would like to stay on at the Dayton-Xenia Rd. location. At the time, Better Kitchen had a lease with Hussong that would not have expired until March 31, 2000. However, Craftsmen was not interested in subletting, but instead wanted its own lease. At this meeting, Craftsmen gave Mr. Hussong some specific numbers on a lease, and Mr. Hussong said he would turn the matter over to his attorney and they would discuss it.
 {¶ 18} After reaching a deal with Craftsmen, Fox told his employees that he was selling the business to Craftsmen and that the employees would have to look for jobs. Fox also stopped taking orders for Better Kitchen and gave Craftsmen's number to customers who called. Some of Fox's employees left quickly, and a few stayed on to finish existing orders. Craftsmen wanted to come in early to remodel the premises, which would require Fox to leave earlier than anticipated. After Craftsmen agreed to pay one-half of November's rent, Fox gave Craftsmen a key to the building. The rent check was dated November 4, 1998, and was sent on to Mr. Hussong after Fox received it from Craftsmen.
 {¶ 19} On Saturday, October 31, 1998, six of the seven stockholders in Craftsmen, representing about 88% of the total stock interest, came to Better Kitchen's showroom and extensively modified the premises. Craftsmen cut a hole in the wall to make a new doorway, removed three or four walls, constructed walls, removed doors from a shower display, removed a sign above a wall with towel bars and paper holders, removed cabinets from a display and from other areas, started to strip off carpet in the office area and tile in the reception area, and replaced a toilet in the employees' bathroom. In addition, at some later point (not on this day), Craftsmen removed display items and placed them in its own showroom. The removed items included a blue Corian counter top, an island, and an angled light bar that matched the island.
 {¶ 20} Subsequently, Craftsmen was not able to reach agreement with the Hussongs on leasing the premises. Readnower then called Fox and said the deal was off. At that point, Fox had one or two years left on the lease. He had moved out of the premises and had left the displays because they belonged to Craftsmen. Fox had closed his business, had no orders coming in, had no place to put the displays, and had no money to rent another place.
 {¶ 21} Ultimately, Fox was able to work out an arrangement with Hussong on the lease, but he was given only fourteen days to remove all the displays. Fox was able to sell some materials for about $8,737.68 (including some items that he returned for credit). However, he had to throw away much of the product because of the short time frame and lack of storage ability.
 {¶ 22} There were some factual disputes, as noted above, that the magistrate resolved generally in Fox's favor. The magistrate found that: (1) the proposed written agreements confirmed the oral agreement; (2) the additional terms were objected to and did not become part of the contract; and (3) the terms that the parties did agree on were the list of assets to be purchased and the price of the assets ($50,000). The magistrate also found that the Statute of Frauds did not prohibit enforcement of the contract due to partial performance. These findings were accepted by the trial court.
 {¶ 23} Notably, neither the trial court nor the magistrate found that this case involved an oral agreement for the lease of a commercial property. To the contrary, the magistrate noted that Craftsmen was not interested in subleasing the property from Better Kitchen, but instead wanted to secure its own lease with the Hussongs. We agree with that finding, and find the first sub-argument without merit. Since there was no oral contract for the lease of the commercial premises, the Statue of Frauds in R.C. 1335.05 would not apply.
 {¶ 24} We also note that even if a lease had been involved, the "predominant purpose" doctrine cited by Craftsmen does not apply to real estate transactions. In this regard, Craftsmen claims that three contracts existed: an agreement for assumption of the lease; an agreement regarding the fixtures on the premises; and a non-competition agreement. According to Craftsmen, the "predominant purpose" of all these contracts involved the lease of Better Kitchen's showroom.
 {¶ 25} The "predominant purpose" test is used to decide if "the predominant factor and purpose of the contract is the rendition of service, with goods incidentally involved, or whether the contract is for the sale of goods with labor incidentally involved." Allied Erecting Dismantling Co. v.Auto Baling Co. (1990), 69 Ohio App.3d 502, 508, 591 N.E.2d 259. The need for such a distinction is based on the fact that Article Two of the Uniform Commercial Code applies to transactions for the sale of goods, not to service contracts. Id. Consequently, if a case arguably involves both services and goods, a court would have to decide if the predominant purpose of the contract is for goods (making Article Two of the UCC applicable) or for services. This would not be an issue in the present case, since the agreed-upon terms were for the sale of goods. In any event, there was no agreement for a lease, and the predominant purpose test does not apply to real estate transactions.
 {¶ 26} Based on the above discussion, the first sub-argument is without merit.
 B. Alleged Oral Contracts in excess of Five Hundred Dollars {¶ 27} Craftsmen's second sub-argument is based on the theory that the contract is not enforceable under R.C. 1335.05 because it was in excess of $500 and could not be performed within one year. However, this portion of R.C. 1335.05 does not apply because the contract was for the sale of goods, which is governed by R.C. 1302.04. In Roth Steel Products v. Sharon Steel Corp.
(C.A. 6, 1983), 705 F.2d 134, the Sixth Circuit Court of Appeals found irreconcilable conflicts between R.C. 1335.05, which is a general statute of frauds, and R.C. 1302.04, which applies more specifically to sales of goods. Id. at 140-42. For example, R.C.1335.05 requires that the writing include all necessary material terms of the contract, while the official comment to R.C. 1302.04
says that a writing is sufficient even if material terms are absent or are misstated. Id. at 141, n. 12. Consequently, the Sixth Circuit held that the more specific statute, R.C. 1302.04, governs sales of goods, and that an individual need only show compliance with that statute. Id. at 141-42.
 {¶ 28} The conflict between R.C. 1335.05 and R.C. 1302.04 has not been widely considered by Ohio courts. However, the Fifth District Court of Appeals has followed Roth. See Lodestar v.Zeigler (October 18, 1989), Richland App. Nos. CA2-630 and CA-2645, 1989 WL 132536, *3. See also, R. Renaissance, Inc. v.Rohm and Haas Co. (S.D.Ohio, 1987), 674 F.Supp. 591, 595 (noting without discussion that R.C. 1302.04 "applies where the contract is for a sale of goods or predominantly for a sale of goods" and R.C. 1335.05 "applies where the contract is for a sale of a process or services or predominantly for a sale of a process or services"). Upon consideration of this point, we agree withRoth and with the Fifth District that R.C. 1302.04 is the appropriate statute to apply where sales of goods are concerned.
 {¶ 29} Craftsmen also points out that R.C. 1335.05 applies to non-competition contracts. Even if this were true, there was no such contract at issue in this case, as the trial court found that the parties never agreed to the terms of a covenant not to compete. We agree with this finding, because the non-competition issue was not even discussed until after the parties had reached agreement. In fact, Readnower, himself, said that he had inserted the covenant not to compete purely for tax purposes.
 {¶ 30} As the trial court noted, Fox rejected the proposed covenant not to compete, and Readnower thereafter rejected a covenant not to compete that Fox drafted. Accordingly, R.C.1335.05 does not apply, and does not preclude enforcement of the agreement between Fox and Craftsmen. In this regard, we should note that even if R.C. 1335.05 did apply, an exception exists for partial performance. We will discuss this matter in more detail later.
 {¶ 31} In view of the preceding discussion, the second sub-argument is without merit.
 C. Oral Contract for Sale of Goods under R.C. 1302.04 {¶ 32} In the third sub-argument, Craftsmen contends that the Statute of Frauds in R.C. 1302.04(A) applies, and that the trial court erred in finding a partial performance exception to the statute. As we mentioned, R.C. 1302.04 contains the Statute of Frauds governing the sale of goods. R.C. 1302.04(A) provides that:
 {¶ 33} "Except as otherwise provided in this section a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this division beyond the quantity of goods shown in such writing."
 {¶ 34} Craftsmen raised this defense at trial, but the magistrate found that an exception in R.C. 1302.04(C)(3) applied. Under this exception, a contract that does not satisfy the requirements of division (A) but which is valid in other respects may be enforced:
 {¶ 35} "with respect to goods for which payment has been made and accepted or which have been received and accepted in accordance with section 1302.64 of the Revised Code." R.C.1302.04(C)(3).
 {¶ 36} Various methods of acceptance can be found in R.C.1302.64. However, the method the magistrate found relevant is that the acceptance occurs when a "buyer does any act inconsistent with the seller's ownership." R.C. 1302.64(A)(3). The trial court did not specifically allude to these sections when it considered Craftsmen's objections. Instead, the trial court relied on common law principles that govern the partial performance exception to the Statue of Frauds.
 {¶ 37} We agree with the magistrate that Craftsmen's "acceptance of the goods" under R.C. 1302.04(C)(3) constituted partial performance. Compare Royal Doors, Inc. v.Hamilton-Parker Co. (Apr. 29, 1993), Franklin App. No. 92AP-938, 1993 WL 141233, *6 [finding an oral agreement enforceable with respect to sale of goods to the extent that part performance can be shown under R.C. 1302.04(C)(3)]. Partial performance in the present case occurred when Craftsmen entered the Better Kitchen showroom, modified displays, and removed portions of the displays to Craftsmen's showroom. These actions were inconsistent with ownership of the assets by Better Kitchen.
 {¶ 38} In this regard, Craftsmen argues that the trial court improperly mixed the "use of the premises" with the "sale of goods." We disagree. Craftsmen did make significant alterations to the leased premises, but its stockholders also removed cabinets from the Better Kitchen displays, removed shower doors from a display, removed a sign above a wall with towel bars and paper holders, and took an island, light box, and counter top to Craftsmen's own showroom. These acts were completely inconsistent with ownership of the displays by Fox and Fox Enterprises.
 {¶ 39} According to Craftsmen, "complete control" over the assets was lacking because Fox and some of his employees were still about the premises, working, on the day that Craftsmen's owners were there. However, at that time, Fox and Craftsmen had concluded a deal for the sale of the displays, and Fox had given Craftsmen a key so that Craftsmen could enter the premises at will. Fox's presence on the premises that day was not an assertion of ownership over the assets that had been sold; he was merely finishing up fabrication of counter top orders that were placed before he closed his business.
 {¶ 40} Other acts of Craftsmen were also consistent with partial performance of the contract. For example, Craftsmen obtained a key to the premises and paid half of Fox's rent for November so that Fox would close his business early and allow Craftsmen to work on the premises. Fox also released his employees in accordance with the agreement and referred customer calls to Craftsmen. And finally, Craftsmen came onto the premises, made significant alterations to the premises, removed cabinets and doors from the Better Kitchen displays, and removed parts of the displays from the premises. Consequently, the record contains ample evidence of partial performance or acceptance of the goods. Compare Mccabe v. Roderer (Nov. 11, 1984), Franklin App. No. 84AP-45, 1984 WL 5976, *1 (indicating that acts such as obtaining a key to a laboratory being purchased, referring to the laboratory by a new name, requesting that the seller dismiss an employee who would not be retained, holding an office party, and directing daily operation of the laboratory for several days, were acts of partial performance that, if proven, constituted acceptance of goods under R.C. 1302.04(C)(3) and R.C. 1302.64).
 {¶ 41} As we mentioned, in approving the magistrate's decision, the trial court focused on a traditional definition of part performance, and did not discuss R.C. 1302.04 and R.C.1302.64. Because the Uniform Commercial Code applies, rather than R.C. 1335.05, the trial court should have referred to R.C.1302.04 and R.C. 1302.64. Nonetheless, the trial court clearly agreed with the magistrate and did reach the correct conclusion on the merits. Therefore, we can affirm the judgment, since the error was not prejudicial. State v. Holley, Montgomery App. No. 20371, 2004-Ohio-4264, at ¶ 7, citing Reynolds v. Budzik
(1999), 134 Ohio App.3d 844, 846, 732 N.E.2d 485.
 {¶ 42} As a final matter, we note that Craftsmen has made a somewhat convoluted argument about "R.C. 1302.04(B)(3)" and the fact that the parties had "agreed" that no goods were exchanged under the contract. First of all, there is no evidence of any such agreement in the record. To the contrary, goods were exchanged. As we said, Fox gave Craftsmen a key to the premises, and Craftsmen took possession of the goods by removing displays from their original locations and by removing display items from the premises. As an additional matter, R.C. 1302.04 does not contain a subsection (B)(3). R.C. 1302.04 does contain a subsection (B), but neither the magistrate nor the trial court relied on that subsection.
 {¶ 43} Based on the above discussion, the third sub-argument is without merit.
 D. Partial Performance {¶ 44} Craftsmen's final sub-argument is that where an unsigned lease exists, possession of premises and payment of rent are still not enough to establish partial performance of a lease. In support of this position, Craftsmen relies primarily onDelfino v. Paul Davis Chevrolet Inc. (1965), 2 Ohio St.2d 282,209 N.E.2d 194, and Lewis v. Morrow (Sept. 15, 2000), Clark App. No. 99 CA 88, 2000 WL 1299522. Both of these cases deal with partial performance and the statute of conveyances.
 {¶ 45} Like the first sub-argument, Craftsmen's position in this regard is based on a faulty premise, i.e., that the parties contracted for a lease. As we mentioned earlier, Craftsmen's own documents do not support this premise. Furthermore, a sub-lease was the only contract in which Fox would have had the ability to participate, and even that would have been contingent upon receiving the lessor's approval for a sub-lease. However, Craftsmen's shareholders testified that they were not interested in a sub-lease.
 {¶ 46} As we previously noted, this case involves the sale of goods and is governed by the more specific Statute of Frauds in R.C. 1302.04. Nonetheless, even if R.C. 1335.05 were applicable, the requirements for the partial performance exception would have been satisfied.
 {¶ 47} As a general matter, agreements may be removed from the operation of the Statute of Frauds by partial performance "only where the party relying on the agreement changes his position to his detriment, thereby making it impractical or impossible to return the parties to their original status."Saydell v. Geppetto's Pizza Ribs Franchise Sys. Inc. (1994),100 Ohio App.3d 111, 121, 652 N.E.2d 218. Where contracts for real estate are concerned, courts generally require acts like "`possession, payment of consideration, and improvements on the land,'" in order to find partial performance. Eske Properties,Inc. v. Sucher, Montgomery App. No. 19840, 2003-Ohio-6520, at ¶ 80 (citation omitted).
 {¶ 48} Because there was no contract for real estate, Fox did not have to prove possession, payment of consideration, and improvements on the land (although all these elements did exist). Furthermore, by focusing on the need to prove more than simply "payment" and "possession," Craftsmen loses sight of the fact that what is important would be whether Fox changed his position to his detriment, making it impractical or impossible to return the parties to their original status.
 {¶ 49} In reviewing the evidence, it is clear that Fox changed his position to his detriment and that returning the parties to their original status would have been impractical or impossible. Fox's actions were also exclusively referable to the agreement and the performance cannot be accounted for in any other manner than having been done in pursuance of the agreement.Delfino, 2 Ohio St.3d at 287; Hughes v. Oberholtzer (1954),162 Ohio St. 330, 330, 123 N.E.2d 393, at paragraph three of the syllabus.
 {¶ 50} In this regard, we note that Fox gave Craftsmen a key to the premises, stopped accepting new business, and referred customers to Craftsmen. Fox also told its employees to find other work, and closed its doors. A few employees, including Fox, stayed on to finish fabricating pending orders. Craftsmen came onto the property, made substantial renovations to the premises and to various displays, and took display materials back to its own property. Whether the physical structure might possibly have been put back in place eventually is not the point. The point is that Fox closed its business, referred its customers, and released its employees, thereby relying detrimentally on the fact that Craftsmen had agreed to buy the assets of Better Kitchen. Accordingly, we reject the claim that the requirements for partial performance were not satisfied.
 {¶ 51} As we have stressed, R.C. 1305.05 and the traditional partial performance exception to the Statute of Frauds do not apply to this case. However, even if they did apply, the exception was satisfied.
 {¶ 52} Because all the sub-arguments are without merit, the first argument is overruled.
 II. The Meeting of the Minds {¶ 53} In the second argument, Craftsmen contends that there was no meeting of the minds as to the essential terms of the contract. The magistrate and trial court found that the parties did agree on essential contract terms, i.e., that Craftsmen would purchase the showroom displays for $50,000. The magistrate and trial court also found that Fox had rejected the Bill of Sale and Covenant Not to Compete, and had sent his own purchase agreement to Craftsmen. Readnower then rejected Fox's purchase agreement because he wanted the transaction to be in two separate documents. Readnower also did not agree to the terms.
 {¶ 54} Both the magistrate and trial court found that the terms of the above agreements were proposals for addition to the contract, but did not become part of the contract under R.C.1302.10(B) because they were rejected. However, the magistrate and trial court noted that under R.C. 1302.10(C),
 {¶ 55} "[c]onduct by both parties that recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case, the terms of the particular contract consist of those terms on which the writings of the parties agree * * *."
 {¶ 56} The magistrate and trial court found that the situation outlined in R.C. 1302.10 precisely fit what had taken place, and further concluded that the parties' conduct recognized the existence of a contract. Consequently, they found that the purchase of the displays for $50,000 was enforceable. We agree with these findings. There was competent credible evidence indicating that at the time of the handshake agreement, Craftsmen had agreed to purchase particular assets for a price of $50,000. The exchange of documents thereafter, and Craftsmen's exercise of dominion over the assets, was conduct recognizing the existence of the contract.
 {¶ 57} We note that Craftsmen again contends in the context of this argument that any agreement was predicated on Craftsmen obtaining a lease for the premises. However, the trial court noted that this claim was contradicted by Craftsmen's own documents, which failed to mention a lease. Again, we agree.
 {¶ 58} Based on the preceding discussion, the second argument is without merit and is overruled.
 III {¶ 59} In the third argument, Craftsmen claims that a contract may not be sustained where there is a mutual mistake on the part of the parties. To support this argument, Craftsmen raises two alleged mutual mistakes. The first is that the landlord would grant a reasonable lease so that Craftsmen could lease the premises where the displays were located. The other alleged mistake pertains to an encumbrance on the assets.
 {¶ 60} In responding to this argument, Fox points out that mutual mistake is an affirmative defense that was neither pled nor tried in the court below. Mutual mistake is not specifically mentioned in Civ. R. 8(C), but it has been held to be an affirmative defense that is waived if not raised in the pleadings. See, e.g., Mayer v. Medancic, Geauga App. Nos. 2000-G-2311, 2000-G-2312, and 2000-G-2313, 2001-Ohio-8784, 2001 WL 1647119, *1, n. 6. Courts have also held that mistake must be pled with particularity under Civ. R. 9(B), and is waived if pleading requirements are disregarded. Butler Cty. Bd. ofCommrs. v. Hamilton (2001), 145 Ohio App.3d 454, 471,763 N.E.2d 618. An affirmative defense may be raised by implied amendment when it conforms to the evidence and has been tried by the express or implied consent of the parties. McCabe/Marra Co. v.Dover (1995), 100 Ohio App.3d 139, 148, 652 N.E.2d 236.
 {¶ 61} In the present case, Craftsmen did not raise mutual mistake in its answer, nor did it ask to amend the pleadings after the trial to raise the issue. Therefore, we conclude that the matter has been waived. Craftsmen did raise mutual mistake in its objections, but only in connection with the lease, not with regard to any encumbrances on the displays. Assuming for the sake of argument that the matter was sufficiently raised in connection with the lease, we still find the claim without merit.
 {¶ 62} "The doctrine of mutual mistake permits rescission of a contract when the parties' agreement is based upon a mutual mistake of either law or fact. * * * A mutual mistake is a mistake by both parties at the time the contract was made as to a basic assumption on which the contract was made, which has a material effect on the agreed exchange of performances." Weberv. Budzar Industries, Inc., Lake App. No. 2004-0L-098,2005-Ohio-5278, at ¶ 34 (citations omitted).
 {¶ 63} The contract in the present case was not based on the assumption that the landlord would grant Craftsmen a reasonable lease. As we stressed earlier, the lease was not even mentioned in the documents that were exchanged. This contradicts Craftsmen's claim that the lease was critical. In addition, Fox testified that no one ever stated that the deal was contingent upon Craftsmen getting a lease with the landlord, thereby indicating that if a mistake existed, it was not mutual. Accordingly, even if we considered the defense of mutual mistake, we would find it without merit.
 {¶ 64} Craftsmen did raise the issue of alleged encumbrances, both in its answer and in objections to the magistrate's decision, but in the context of fraud, not mistake. Specifically, Craftsmen claimed that Fox attempted to defraud Keybank and Craftsmen because there were liens outstanding on the goods at the time of the sale. In contrast to this argument, Craftsmen now claims the encumbrances were a "mutual mistake" preventing enforcement of the contract. Even if we were to address this issue, we would find it without merit. Fox testified that he intended to obtain assurances from the bank that any liens did not apply to the displays. He further indicated that he intended to pay off the liens with the sale proceeds. And finally, we note Readnower's testimony that the issue of liens did not arise until after Fox received the Bill of Sale and Covenant Not to Compete. Because the magistrate found that the Bill of Sale and Covenant were generated after the parties reached agreement, the presence of any liens could not have been a mutual mistake about a basic assumption at the time the contract was formed.
 {¶ 65} Accordingly, the third argument is without merit and is overruled.
 IV {¶ 66} In its fourth argument, Craftsmen claims that the trial court erred by finding that Doug Readnower had apparent authority to bind Craftsmen on the contract. Although the magistrate and trial court found that Readnower had apparent authority, Craftsmen contends that Readnower's acts alone could not establish apparent agency. Instead, Craftsmen, as the principal, must have held Readnower out to the public as having sufficient authority to bind the corporation.
 {¶ 67} In Master Consolidated Corp. v. BancOhio Natl. Bank
(1991), 61 Ohio St.3d 570, 575 N.E.2d 817, the Ohio Supreme Court held that:
 {¶ 68} "[i]n order for a principal to be bound by the acts of his agent under the theory of apparent agency, evidence must affirmatively show: (1) that the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority, and (2) that the person dealing with the agent knew of those facts and acting in good faith had reason to believe and did believe that the agent possessed the necessary authority." Id. at syllabus.
 {¶ 69} In Master Consolidated, the court went on to clarify the relationship between estoppel and apparent authority. Specifically, the court said that the two concepts:
 {¶ 70} "`are similar in that they are based on the underlying principle that a person shall be bound by his words or deeds. They are distinguished as follows: estoppel is essentially the principle that a person must compensate another for any change of position (loss) induced by reliance on what the person said or otherwise manifested, because it would be unjust to allow him to deny the truth of his words or manifestations; apparentauthority is based on the objective theory of contracts, and arises when a person manifests to another that an agent or third person is authorized to act for him, irrespective of whether the person really intended to be bound, of whether the person told the same thing to the agent, and of whether the other person changed his position.'" Id. at 577, n. 5, quoting from 1 Ohio Jury Instructions (1990) 200, Section 15.10.
 {¶ 71} Some courts have held that agency by estoppel and apparent authority are equivalent, and are based on the same elements. See Dickinson v. Charter Oaks Tree Landscaping Co.,Inc., Franklin App. No. 02AP-981, 2003-Ohio-2055, at ¶ 24. Regardless of which view is applied, there was sufficient evidence that Craftsmen held Readnower out as authorized to act for the corporation in this transaction.
 {¶ 72} Notably, Readnower was vice-president and treasurer of Craftsmen, and was a 25% stockholder. Readnower conducted the vast majority of the negotiations, and was present at the meeting in which Fox claimed that a deal was struck. Moreover, the Bill of Sale and Covenant Not to Compete that Readnower gave Fox on behalf of Craftsmen did not list the seven stockholders by name. Instead, these documents contained a single line for a signature that was to be made "by Craftsmen Home Improvements, Inc." The clear implication from this document is that one person (and logically, the person delivering the documents) had the power to act for Craftsmen. As an additional matter, 88% of the stockholders came to Better Kitchen to accept possession of the displays and to remodel. Under the circumstances, it is clear that Craftsmen clothed Readnower with apparent authority to act on its behalf.
 {¶ 73} Even if we did not find apparent authority, we would conclude that Fox established agency by estoppel. In GeneralCartage Storage Co. v. Cox (1906), 74 Ohio St. 284, 294,78 N.E. 371, 372, the Ohio Supreme Court held that:
 {¶ 74} "`[w]here a principle [sic] has, by his voluntary act, placed an agent in such a situation that a person of ordinary prudence, conversant with business usages, and the nature of the particular business, is justified in assuming that such agent is authorized to perform on behalf of his principle [sic] a particular act, such particular act having been performed the principle [sic] is estopped as against such innocent third person from denying the agent's authority to perform it'" (citation omitted). We have applied the same theory to find agency by estoppel on the part of a contracting party. See, e.g., EskeProperties, Inc. v. Sucher, Montgomery App. No. 19840,2003-Ohio-6520, at ¶ 118. Based on the above facts, Fox was justified in assuming that Readnower was authorized to act on Craftsmen's behalf.
 {¶ 75} Furthermore, while ratification of an agent's acts is not required, the majority of Craftsmen's stockholders entered Better Kitchen and exerted control over the displays. A reasonable interpretation of these actions is that a majority of the stockholders ratified Readnower's authority and agreement to a contract. Foust v. Valleybrook Realty Co. (1981),4 Ohio App.3d 164, 167, 446 N.E.2d 1122.
 {¶ 76} In light of the preceding discussion, the fourth argument is without merit and is overruled.
 V. Damages {¶ 77} In the fifth argument, Craftsmen contends that Fox and Better Kitchen did not establish damages with a reasonable degree of certainty, and that the trial court improperly awarded damages based on speculation. We disagree. If Craftsmen had fully performed under the agreed-upon terms of the contract, Fox would have realized $50,000 for the showroom displays. However, because Craftsmen breached the contract and repudiated the goods, Fox was required to dispose of what goods he could, at a significant loss.
 {¶ 78} R.C. 1302.77 provides various general remedies for aggrieved sellers of goods, such as withholding delivery, reselling and recovering damages under R.C. 1302.80, recovering for non-acceptance under R.C. 1302.82, or recovering the price under R.C. 1302.82. The official comment to R.C. 1302.77 stresses that sellers are not required to elect a remedy and that the remedies are cumulative in nature. In the present case, the recovery Fox obtained fits within "non-acceptance" under R.C.1302.82. This section provides that: "(A) Subject to division (B) of this section and to the provisions of section 1302.97 of the Revised Code with respect to proof of market price, the measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in section 1302.84 of the Revised Code, but less expenses saved in consequence of the buyer's breach.
 {¶ 79} "(B) If the measure of damages provided in division (A) of this section is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit, including reasonable overhead, which the seller would have made from full performance by the buyer, together with any incidental damages provided in section 1302.84
of the Revised Code, due allowance for costs reasonably incurred, and due credit for payments or proceeds of resale."
 {¶ 80} Applying the measure of damages in R.C. 1302.82
returns a non-breaching party to the position occupied before the contract was made, i.e., to the status quo. S-Products, B.V. v.Noral, Inc. (Nov. 19, 1992), Cuyahoga App. No. 61347, 1992 WL 354836, *8. This accords with the general rule on contract damages, which is that "`a party who has suffered damages as a result of a breach of contract is entitled to his "expectation interest," or his interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed.'" Bulcher v. Prime Time MarketingMgt., Inc., Montgomery App. No. 19192, 2002-Ohio-3806, at ¶ 26 (citation omitted). It is also consistent with the general philosophy of the Uniform Commercial Code that the remedies provided "shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed." R.C. 1301.06(A).
 {¶ 81} As we mentioned, Craftsmen claims that the evidence about damages was speculative. Again, we disagree. Both sides assigned a value of $50,000 to the displays. While Readnower testified that the displays were only worth that much because of their location in the premises, the trial court did not find that testimony credible. Instead, the court accepted Fox's testimony.
 {¶ 82} As we mentioned earlier, Fox said he had no place to store the goods because he had closed his business and could not afford to maintain the leased premises. When the lessor wanted the premises vacated, Fox had only fourteen days to try to sell the goods. He was able to sell $8,737.68 worth of goods, but ended up throwing most of the rest of the display items into a large dumpster that he had rented. Fox's testimony on this point was substantiated by a witness, who saw Fox and a former partner breaking up the contents of the showroom and throwing displays in a large rollout dumpster during February, 1999. This was around the time the lessor required Fox to vacate the premises. Fox told this witness at the time that he was throwing the goods away because he had nowhere to store the items. There was also testimony from witnesses who corroborated the sale of various items on the list.
 {¶ 83} If Craftsmen had paid for the goods as agreed, Fox would have made $50,000 in profit, because the displays had been paid for previously. This was also the agreed-upon price of the contract. Consistent with R.C. 1302.82(A) and (B), the trial court credited Craftsmen with $8737.68 for display items that Fox was able to sell.
 {¶ 84} Craftsmen argues that the damages were not established with certainty, due to some conflicts in Fox's testimony during deposition and at trial about dates when displays were sold. Craftsmen also relies on conflicts that allegedly arise from correspondence. However, the correspondence was not admitted at trial and is not part of the record. We note that there were contradictions in the testimony of various witnesses, including Craftsmen stockholders, as to a number of matters. This is not surprising, since nearly five years elapsed between the sale and the time of trial. Both sides also kept rather poor documentation. The magistrate clearly found Fox more credible, by accepting Fox's testimony as to the amount of goods he was able to sell.
 {¶ 85} We have stressed many times that credibility decisions belong to the trier of fact, which has the best opportunity to observe the demeanor of witnesses. See, e.g., Green v. Lemarr
(2000), 139 Ohio App.3d 414, 425, 744 N.E.2d 212. We have also held that decisions on damages are "`within the discretion of the trial court, and will be sustained if * * * [they are] supported by sufficient credible evidence and * * * [are] not against the manifest weight of the evidence.'" Bulcher, Montgomery App. No. 19192, 2002-Ohio-3806, at ¶ 26 (citation omitted). In the present case, the decision on damages was supported by competent, credible evidence.
 {¶ 86} Craftsmen contends, as a final point in this context, that the trial court did not specifically address the claim about damages. In ruling on the objections, the trial court discussed the case in detail and found that Craftsmen had breached the contract by not paying any of the $50,000 that was owed. The court also adopted the magistrate's decision and entered judgment in Fox's favor in the amount of $41,262.32, which is the amount found by the magistrate after deducting what Fox received for the goods he was able to sell. However, the trial court did not specifically include a sentence stating that it was overruling the damage objection.
 {¶ 87} Although the issue is close, we find that remand is not required under the circumstances of this case, since remand would simply elevate form over substance. Compare H.L.S. BondingCo. v. Fox, Franklin App. No. 03AP-150, 2004-Ohio-547, at ¶ 9 (trial court's silence on objections presumes the objections were overruled when court entered judgment disposing of objections),Sharples v. Sharples, Butler App. No. CA2003-10-274,2004-Ohio-3352, at ¶ 2 (trial court did not expressly say it was overruling objections, but court held a hearing and affirmed magistrate's decision, thereby effectively "ruling" on the objections in compliance with Civ. R. 53), and Schmidli v.Schmidli, Belmont App. No. 02 BE 63, 2003-Ohio-3274, at ¶ 12-15 (noting that appellate courts have refused to presume that objections are overruled where the trial court fails to say so).
 {¶ 88} In McCain v. McCain, Champaign App. No. 02CA04, 2002-Ohio-4791, we noted that the trial court's ruling in a case had overruled an objection to a magistrate's decision, if only by implication. Id. at ¶ 13. We concluded that despite this fact, we were required to dismiss the case because the court's journal entry failed to adopt the magistrate's decision, which was required by Civ. R. 53(E)(4). Id. at ¶ 14-18. In contrast toMcCain, the trial court in the present case did adopt the magistrate's decision when it entered judgment. Accordingly, we need not dismiss the appeal, nor must we remand the case. However, in the future, the better practice for the court would be to explicitly state that all objections have been overruled.
 {¶ 89} Based on the preceding discussion, the fifth argument is without merit and is overruled.
 VI. Ownership of the property {¶ 90} In its final argument, Craftsmen contends that Fox and Better Kitchen did not own the assets and had nothing to sell, because Fox had taken out a loan with KeyBank that was secured by the assets that were being sold. In our opinion, this is a non-issue.
 {¶ 91} In the first place, the testimony of both Readnower and Fox indicates that the subject of liens or encumbrances did not arise until after Readnower gave Fox the Bill of Sale and Covenant Not to Compete. Because the magistrate concluded that the agreement for the sale of assets for $50,000 occurred before these documents were delivered, any language relating to liens or encumbrances was simply a proposal for additional terms that was never accepted. R.C. 1302.10. It would also have been a material alteration of the terms to which the parties had agreed.
 {¶ 92} Readnower's Bill of Sale states that:
 {¶ 93} "SELLERS warrants [sic] that there are no liens or encumbrances on the goods sold, and that SELLERS' title to the goods is clear and merchantable. SELLERS shall also defend BUYERS from any adverse claims to SELLERS' title to the goods sold."
 {¶ 94} The subsequent purchase agreement that Fox submitted to Craftsmen stated that:
 {¶ 95} "The SELLER warrants that there are no liens or encumbrances on the goods sold, and the Sellers' title to the goods is clear and merchantable and will be relinquished at the term of the purchase agreement."
 {¶ 96} A material alteration is one that would "result in surprise or hardship if incorporated without express awareness by the other party." Comment 4 to R.C. 1302.10. See also, SSTBearing Corp. v. MTD Consumers Group, Inc., Hamilton App. No. C-040267, 2004-Ohio-6435, at ¶ 29.
 {¶ 97} Because liens and encumbrances were never discussed, incorporating their release into the Bill of Sale would have resulted in surprise to Fox. Furthermore, although Fox included a lien clause in the purchase agreement, Fox's proposal was materially different from the provision in the Bill of Sale. Specifically, Fox's clause indicates that title to the goods would be relinquished at the term (presumably the termination) of the purchase agreement — which was scheduled to last for three years. Fox's proposal also materially differed from the Bill of Sale because it omitted the "duty to defend."
 {¶ 98} The magistrate did not discuss the proposals for liens and encumbrances in detail, beyond noting that Fox had rejected the Bill of Sale and Covenant Not to Compete because he needed to obtain a release of liens. However, based on the magistrate's finding that the only agreed-upon contract terms were for the sale of an agreed-upon list of assets for $50,000, it is clear that the magistrate did not find the lien or encumbrance provisions to be part of the contract. In objecting to the magistrate's decision, Craftsmen asked the trial court to find that an oral contract on which encumbrances exist may not be legally enforced without the assent of a lien holder. Again, the trial court did not explicitly discuss this argument, but its decision necessarily overrules the objection. If the trial court felt that the oral agreement was unenforceable, it would not have found a breach, would not have adopted the decision of the magistrate, and would not have awarded judgment in the amount of $41,262.32.
 {¶ 99} As a further matter, Craftsmen's breach of the agreement made the issue of liens or encumbrances irrelevant. In view of Craftsmen's repudiation or non-acceptance, whether KeyBank or any other entity had an interest in the goods was irrelevant. This is particularly true since Craftsmen did not assert the existence of a lien or encumbrance as a reason for the breach, at the time the breach occurred. Instead, as the magistrate and trial court noted, Craftsmen walked away from the agreement. Under R.C. 1302.68, where anticipatory repudiation occurs, an aggrieved seller may resort to any remedy for breach provided by R.C. 1302.77, and may suspend his own performance. Consequently, even if liens or encumbrances needed to be released, Craftsmen's breach allowed Fox to suspend his own performance and sue for the breach.
 {¶ 100} Based on the above discussion, the sixth argument is without merit and is overruled.
 {¶ 101} Because all the arguments or assignments of error have been overruled, the judgment of the trial court is affirmed.
Fain, J., and Donovan, J., concur.